[No. F049687. Fifth Dist. Jan. 30, 2007.]

In re MALCOLM M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MALCOLM M., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

---

[*]Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

## COUNSEL

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Kathleen A. McKenna, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, P. J.**—At age 10, appellant Malcolm M. joined several of his relatives in robbing and beating to death 69-year-old Alejandro Escareno. As a result, he was found to have committed first degree murder (Pen. Code,[1] §§ 187, 189) and robbery (§ 211), and was adjudged a ward of the juvenile court (Welf. & Inst. Code, § 602). The maximum period of confinement was declared to be 25 years to life, but a commitment to the former California Youth Authority (CYA)[2] was stayed due to Malcolm's age. Instead, Malcolm was committed to the Ashjian Treatment Center for 365 days, and ordered placed in a group home after that period. In pertinent part, he was also ordered to obey all laws and not to associate with any known gang members.

On October 3, 2003, Malcolm was found to have complied with the terms of his rehabilitation plan, and was furloughed from his group home placement in San Jose to reside with his mother in Fresno. All prior orders remained in effect, in addition to which Malcolm was ordered not to visit his grandmother E.'s home on Garrett Street.

On June 18, 2004, a supplemental petition for modification (Welf. & Inst. Code, § 777) was filed, alleging that Malcolm had violated the terms of his probation requiring that he obey all laws and not associate with known gang members. In support, it was alleged that Malcolm was a passenger in a vehicle that was occupied by a known gang member who was on parole. In the glove box was a stolen, loaded .38-caliber revolver, for which the driver of the vehicle took responsibility. Malcolm was ordered to avoid Garrett and California/Thorne Streets, and not to associate with any gang members, including those who were members of his family.

A new petition (Welf. & Inst. Code, § 602) was filed on August 12, 2005. In the third amended petition, filed January 9, 2006, it was alleged that

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] CYA is now known as Juvenile Justice in the Department of Corrections and Rehabilitation (Gov. Code, §§ 12838, 12838.5). For purposes of clarity, we shall refer to it as CYA.

Malcolm possessed an assault weapon (§ 12280, subd. (b); count 1), carried a loaded firearm in a public place (§ 12031, subd. (a)(1); count 2), was an active participant in a criminal street gang (§ 186.22, subd. (a); count 3), and was an accessory after the fact to possession of an assault weapon (§ 32; count 4). As to counts 1 and 2, it was further alleged that Malcolm committed the offense for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). A supplemental petition for modification (Welf. & Inst. Code, § 777) was also filed based on the same incident, and alleged that Malcolm had violated the terms of his probation by not obeying all laws, being in a vehicle with a "validated" gang member, being in a vehicle with an AK-47-type rifle, and being out past his curfew. Malcolm's probation subsequently was revoked.

Following a contested adjudication hearing, counts 1, 3, and 4 of the third amended petition were found to be true, as were the gang enhancement allegations. In addition, Malcolm was found to have violated the terms of his probation. He was committed to CYA, with a maximum period of confinement of 25 years to life, and now appeals.

In the published portion of this opinion, we will hold that, in order for an accused to be found liable both as an aider and abettor and as an accessory after the fact with respect to the same felony, the acts constituting that felony must have ceased at the time of the conduct that renders him or her culpable as an accessory. In the unpublished portion, we will reject Malcolm's First Amendment challenge to section 186.22, but will conclude the evidence is insufficient to support the juvenile court's true findings under subdivisions (a) and (b) of that statute. Accordingly, for the reasons that follow, we will affirm the true finding on count 1, but otherwise reverse and remand the matter for further proceedings.

## FACTS

### I

### PROSECUTION EVIDENCE

Between 10:30 and 11:00 p.m. on August 10, 2005, Jamal Gray and his cousin were at their grandmother's house on Strother Street when a dark or blue sport utility vehicle (SUV) pulled up next to the house. Two males exited the backseat, while other people remained inside. When the males came into the yard, Gray saw that one had a long gun strapped to his body. The other male was alongside him. Gray, who had never seen either individual before, told them that they had to leave. They had no problem with this.

Gray saw a white truck or SUV slowly pull up behind the dark SUV. The males started back to their vehicle, then Gray heard shots fired from the white

vehicle. As it was leaving, Gray saw the gun being fired in its direction. At no time did Gray see the second male with a firearm.

Sergeant Macias of the Fresno Police Department was in the vicinity when he heard shots fired. Within approximately 15 seconds, he saw a greenish-blue Chevrolet Tahoe going eastbound on Strother. Macias's headlights illuminated two females in the front, but, despite his clear view, he did not see anyone else in the vehicle. As it drove past, he noticed that the taillights were out. Macias followed the vehicle, then saw what appeared to be a third person "pop up" in the backseat. After requesting assistance, Macias initiated a traffic stop. The vehicle appeared to be pulling over, but then quickly took off for a brief second. It then pulled over and stopped. This was less than half a mile from the location at which the shots were fired.

As Macias approached the vehicle, he realized there was a fourth person—Malcolm—inside. Malcolm was slouched down in the seat behind the driver and was barely visible. Concerned for his own safety, Macias tried to get the male subjects in the backseat to keep their hands visible, but they did not comply with his directions and instead kept moving their hands out of his sight. In addition, the driver did not initially comply with Macias's request to turn off the ignition, nor was there compliance with Macias's order to unlock the doors. Someone in the backseat was telling the people in the front seat that they did not have to listen to Macias.

Macias illuminated the vehicle's interior with his flashlight, at which point he saw a folding-stock, AK-47-style assault rifle on the floorboard of the rear passenger area. It was on the passenger side, but the barrel essentially was in the middle portion of the seat. Hakkim H., Jr., the second male in the vehicle, was sitting closest to it. His feet were on top of it, and he appeared to be trying to hide it. Malcolm's feet were more toward the middle, where the barrel was located, and were on top of the barrel. Officer Williams, who had arrived to assist Macias, was able to get the doors unlocked, and he and Macias removed Malcolm and Hakkim from the vehicle. To Macias's knowledge, no firearms or ammunition were found on Malcolm's person.

Gray subsequently identified this vehicle as the dark-colored SUV that had pulled up in front of his grandmother's house. He was unable to identify anyone who had been inside, and did not know whether Malcolm was one of the males. Three Wolf brand shell casings, 7.62 by 39 millimeters, were found at the scene of the shooting. No other shell casings were found. The magazine in the weapon found in the SUV contained 23 Wolf 7.62 by 39 millimeter live cartridges, which appeared to be less than its full capacity, and there was a live round in the chamber. No usable prints were found on either the weapon or the ammunition.

Fresno Police Detective Flowers, who specialized in African-American gangs and gang members, testified as an expert on gang identification. He explained that the Department of Justice has established 10 criteria for validating someone as a gang member. If three are met, Fresno County law enforcement agencies consider the person to be validated as a criminal street gang member.[3] Criteria include self-admission, gang tattoos, wearing gang clothing, associating with known gang members, being arrested with known gang members, displaying gang hand signs, and corresponding with known gang members. A person can also be identified as a gang member by a reliable source, such as the Department of Corrections.

Flowers was familiar with the M. Family, which is considered by law enforcement to be a criminal street gang pursuant to section 186.22, based on the activities of some of the family's members. Some individuals without the M. surname are related to M. Family members. Although not all family members are gang members, there are approximately 23 validated members of the gang. African-American gangs in Fresno County are predominantly neighborhood-oriented, and M. Family members usually refer to themselves as Block Number 2300, Block South Walnut, Walnut Posse, and 107 Hoover Crip. M. Family members are known for street-level and midlevel sales of narcotics, as well as shootings and assaults. In addition, some of the members were involved in a homicide.

Flowers had also had contact with members of a predominantly African-American criminal street gang known as the West Side Strother Boys (WSSB), which has approximately 70 members and is known for street-level and midlevel sales of narcotics, specifically rock cocaine. They also engage in armed robberies, shootings, driveby shootings, and assaults with deadly weapons. Members of the M. Family gang and the WSSB sometimes associate with each other. Hakkim H., Jr., is a validated WSSB member.

According to Flowers, Malcolm is a validated member of the M. Family gang. He meets four or five of the validation criteria, including that he admitted membership as a condition of a plea, and was identified as a member by reliable sources in the Fresno County Probation Department and by law enforcement officers. In addition, he associated with known gang members and was arrested with a gang member.[4] Flowers had been told that Malcolm and Hakkim are cousins. This makes no difference for purposes of establishing the validation criterion, however.

Flowers responded to the traffic stop that was conducted in relation to the shooting on August 10, 2005. He interviewed both juveniles. He noted that

---

[3] Some counties in California only require two criteria.

[4] Flowers relied not only on Malcolm's arrest with Hakkim, but also on his initial arrest during the murder case.

Malcolm wore predominantly red clothing, which Flowers found to be indicative of gang behavior because, although the color red itself is not affiliated with the M. Family gang, it is the primary color of choice for the WSSB. Moreover, red is considered an intimidating color by some people. Hakkim H., Jr., was wearing a memorial shirt for two of his friends who were both validated Strother Boys. In addition, Malcolm identified himself, to one of the officers at the scene, as Alpha Omega M.

According to Flowers, the fact the vehicle was stopped with two females in the front seat and two males in the backseat was a consistent modus operandi used specifically in the southwest area. It is advantageous for a gang member who is either wanted or potentially engaged in criminal conduct to have a female driver of a clean vehicle (i.e., one without expired registration, in which all lights are functioning, etc.), because it does not draw the attention of law enforcement.

Flowers explained that gang members will often have associates, friends, or family members, who also engage in criminal conduct, support that person in some crime. If an individual got out of a car armed with a firearm, and another individual got out of the same car without being armed, the second person could be a lookout for approaching rival gangs or law enforcement. Also, a juvenile with less of a criminal record can be used as a scapegoat for the individual who has a more substantial criminal history and who, if caught, would face more time in prison. Moreover, since gang members share weapons, the firearm would be available for offensive or defensive use in the gang setting by the individual who was unarmed.

Flowers was asked a hypothetical question based on the circumstances of this case. In his opinion, what transpired was a continuum of two rival groups with repeated acts of retaliation. If two individuals who had gotten out of a blue SUV were the target of a driveby shooting from occupants of a white vehicle, and, as the white vehicle was leaving the scene, one of the individuals from the blue SUV opened fire, this individual's actions would be what is expected of gang members. In such a situation, they are going to retaliate, as opposed to contacting the police. If the two were not gang members, however, they might be defending themselves.

The parties stipulated that Lonnie Packard had previously been convicted of one or more of the predicate offenses necessary to establish the elements of section 186.22, specifically not excluding a violation of Health and Safety Code section 11351. They entered into a similar stipulation with respect to Dionne Singleton, who had been convicted of violating section 246.

## II

## DEFENSE EVIDENCE

At the time of Malcolm's adjudication hearing, Hakkim H., Jr., was already serving a CYA commitment for being in possession of an assault rifle on or about August 11, 2005. The adjudication also involved the admission to a gang enhancement allegation.[5]

Malcolm and Hakkim are cousins. Hakkim admitted possessing the AK-47-style weapon involved in this case, having purchased it a couple of days before his arrest. He also admitted having it with him that night. Although Malcolm was present when Hakkim had the firearm on his person, Hakkim did not allow Malcolm to touch it or the ammunition.

According to Hakkim, he and Malcolm were not "hanging out" on the night of the arrest; Malcolm was younger than Hakkim, and did not "hang out" with people like him. Hakkim was with his female cousin, who had taken him to the Strother residence so he could say hello to a couple of his friends. Someone came by, shooting, and Hakkim returned fire with the assault rifle. He then hurried to pick Malcolm up at an aunt's house and drop him off at home, as Hakkim was on his way to his own residence. Malcolm was not with Hakkim when the shooting occurred. Hakkim was with two females, but no other male. They were stopped by police right after they picked Malcolm up. Hakkim was trying to cover the assault rifle with his feet when they were pulled over, but he did not know what Malcolm was doing at the time. Malcolm did not know the gun was in the vehicle, as Hakkim had just set it down by his own feet.

## DISCUSSION

## I

## IMPOSITION OF AIDING AND ABETTING AND ACCESSORY LIABILITY FOR SAME OFFENSE

As noted, it was alleged in count 1 of the current petition that Malcolm possessed an assault weapon (§ 12280, subd. (b)), and, in count 4, that he was an accessory after the fact to possession of that weapon (§ 32). The juvenile court found count 1 to be true on an aider and abettor theory, in that Malcolm acted as Hakkim's "eyes and ears" when Hakkim exited the vehicle at the house on Strother. The court found count 4 to be true based on Malcolm's conduct in attempting to conceal the weapon when the vehicle subsequently was stopped by police. Malcolm now contends he could not properly be

---

[5] Hakkim also had a sustained petition, on August 31, 2004, for possession of a loaded firearm.

found to be both principal and accessory to the same crime, as there was no conduct other than the aiding and abetting to support the accessory allegation. Accordingly, he says, his adjudication on count 4 must be reversed and the count dismissed. Respondent replies that both counts should be upheld because the charges were based on factually separate conduct. We conclude that, although the charges were indeed based on factually separate conduct, dual liability cannot be imposed because the underlying felony was a continuing one that was in progress at both times Malcolm engaged in culpable conduct.

Section 31 provides that "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." "A 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 40 [61 Cal.Rptr.2d 84, 931 P.2d 262], quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) By contrast, section 32 provides that "[e]very person who, *after* a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, . . . having knowledge that said principal has committed such felony . . . , is an accessory to such felony." (Italics added.) In order to convict a person under this section, there must be proof that a principal committed a particular felony, the accused knew the principal committed a felony, the accused did something to help the principal get away with the crime, and the accused acted with the intent to help the principal get away with the crime. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 536 [26 Cal.Rptr.2d 323].)

In *People v. Prado* (1977) 67 Cal.App.3d 267, 273 [136 Cal.Rptr. 521] (*Prado*), the appellate court held that "when an accused is convicted of violation of Penal Code section 32, which necessarily requires that a *principal* have committed a specific completed felony and that he knowingly aided that principal with intent that the principal escape arrest, he cannot be convicted as a principal in that completed felony. His state of mind—the intent required to be an accessory after the fact—excludes that intent and state of mind required to be a principal. The requisite intent to be a principal in a robbery is to permanently deprive the owner of his property. Thus, this is a totally different and distinct state of mind from that of the accused whose intent is to aid the robber to escape. These are mutually exclusive states of mind and give rise to mutually exclusive offenses."

Courts generally have rejected the notion that being a principal and being an accessory are necessarily mutually exclusive as a matter of law. For

instance, in *People v. Wallin* (1948) 32 Cal.2d 803 [197 P.2d 734], Mrs. Paz had a disabled child, and she and the defendant discussed killing the little girl. When Mrs. Paz did so, the defendant helped her dispose of the body. When Mrs. Paz testified against the defendant at his trial, he requested that the jury be instructed that she was an accomplice whose testimony required corroboration. The trial court's denial of his request formed the major claim of error raised following his conviction for being an accessory to murder. (*Id.* at pp. 804–805.) On appeal, the Attorney General argued that Mrs. Paz could not be an accessory after the fact to her own crime; hence, she was incapable of committing the offense with which the defendant was charged. (*Id.* at p. 806.) The California Supreme Court disagreed, stating: "It may be that a murderer who acts alone in concealing her crime cannot be separately charged as an accessory, but it does not follow that she cannot become liable as such if she encourages another to aid her in avoiding arrest and punishment. . . . [A] person who is not independently capable of committing an offense can, by aiding, abetting, advising or encouraging another to commit the crime, be made liable to prosecution as a principal in such offense by reason of section 31. [¶] The murder was completed as soon as the child was killed, and no subsequent acts on the part of Mrs. Paz or any other person were required to be shown in order to establish the elements of that offense. Defendant's crime of being an accessory under section 32 was separate and distinct [citation], although it, of course, depended on the previous commission of the murder. He became chargeable under section 32 when he aided Mrs. Paz to conceal her crime, and she became liable to prosecution for the identical offense by reason of section 31 when she encouraged him to assist her in avoiding arrest and punishment." (*Id.* at pp. 806–807.)

In *People v. Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423], Beatrice Jackson was shot and killed by a bullet meant for someone else. The prosecutor proceeded on the theory that the defendant aided and abetted the murder by his actions before and during the shooting (agreeing to make an armed show of force with the shooter and another person, bringing the shooter to the scene, and standing ready to assist with an additional weapon as the shooter confronted the intended target), and was an accessory to the murder based on his actions after the shooting (concealing the shooter's jacket and gun, and giving false statements to the police). (*Id.* at p. 1324.) The defendant argued that he could not be convicted both for murdering Beatrice Jackson and for being an accessory to her murder, but the appellate court disagreed, finding that "*Prado* should be limited to the factual circumstance presented therein, i.e., to cases in which the two convictions rest upon '[e]ssentially the same acts.' [Citation.] Nothing in section 32, defining accessories, suggests the Legislature intended as a matter of law to exclude those who, having perpetrated or intentionally assisted in the commission of a felony, then act further to harbor, conceal or aid the escape of another of the principals." (*Id.* at p. 1323, italics omitted.) The court went on to state:

"[T]here is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime. When a felony has been completed and a person knowingly and intentionally harbors, conceals or aids the escape of one of the felons, that person is guilty as an accessory to a felony under section 32, whatever his or her prior participation in the predicate felony. [Citation.] [¶] . . . [¶] Under [the] circumstances, defendant's responsibility both as an accomplice to the murder and for the separate and distinct crime of acting as an accessory to a felony was neither logically inconsistent nor legally prohibited. Although defendant was technically convicted of being an accessory to his own crime, in substance he was convicted for two different sets of actions." (*Id.* at pp. 1324–1325.)

In *People v. Riley* (1993) 20 Cal.App.4th 1808 [25 Cal.Rptr.2d 676], Hayden robbed a prostitute he had patronized at a motel, and was then himself assaulted and robbed by the prostitute's boyfriend. Hayden returned to the scene a short time later in a truck driven by the defendant. The defendant drove slowly around the parking lot, where some of the motel's guests had congregated. He then stopped and Hayden fired at the group, killing the victim in an apparent case of mistaken identity. The next day, the defendant gave the murder weapon to his business partner, either for disposal or for safekeeping. (*Id.* at pp. 1810–1812.) A jury convicted the defendant of being an accessory to the murder, but deadlocked on the murder charge itself. Upon retrial, the defendant was convicted of second degree murder. (*Id.* at p. 1812.) On appeal, he argued that his accessory conviction precluded retrial of the murder charge, because, as reasoned in *Prado*, a person cannot be convicted both as a principal of a substantive offense and as an accessory after the fact to that offense. Hence, the defendant's argument ran, his conviction as an accessory operated as an implied acquittal of the murder. (*People v. Riley, supra,* 20 Cal.App.4th at p. 1813.) The appellate court disagreed, finding, by way of reference to *Prado*'s example of a robbery, "there is nothing inherently or necessarily inconsistent between an intent to deprive someone of property and the intent to aid a robber to escape. Nothing prevents a person from harboring both intents; the intents are different, and not overlapping. [¶] . . . [¶] Here, (unlike *Prado*) the conviction as a principal and the conviction as an accessory depend upon entirely different conduct: Defendant's acts of obtaining the gun and speed loader, giving them to a drunk and angry Hayden, suggesting that Hayden return to the motel to retrieve his property, and driving Hayden to the motel in defendant's truck comprise the essentials of his guilt as a principal to the murder. The conviction of accessory is based on defendant's act, the following day, of attempting to dispose of the gun. This act occurred after the murder was complete." (*Id.* at pp. 1814–1815.) The court subsequently reiterated: "Once the murder was completed, defendant's further acts of attempting to dispose of the murder weapon were entirely separate and distinct, and served a further

and different purpose. The imposition of separate liability for these distinct and independent actions was proper." (*Id.* at pp. 1816–1817.) Accordingly, the court affirmed both convictions. (*Id.* at p. 1817.)

In *People v. Nguyen, supra,* 21 Cal.App.4th 518, the defendants were part of a group that robbed a tanning salon and sexually assaulted the proprietor in an attempt to get her to surrender her valuables. Shortly after, the group robbed a relaxation spa, where one occupant was sexually violated with a finger. The defendants were convicted of robbery and sexual offenses arising from the first incident, as well as robbery arising from the second incident. With respect to that episode, however, they were acquitted of the sex offense and convicted of being accessories after the fact. (*Id.* at pp. 525–527, 535–536.) In finding insufficient evidence to support the accessory convictions (*id.* at pp. 538–539), the appellate court observed: "[T]he mutually exclusive concept [set forth in *Prado*] should not be overstated. This concept is merely an application of the 'bright line' rule . . . referred to in connection with principals under section 31, that is, anyone 'concerned' in the commission of a crime, no matter how slight such concern may be, is guilty as a principal. [Citation.] Such a person must commit or intentionally encourage or assist another to commit an offense before or during the commission of the crime. [Citation.] An accessory, on the other hand, must lend assistance to the principal after the commission of the offense with the intent of helping him escape capture, trial or punishment. [Citations.] A principal may, of course, also commit acts with the requisite intent that would otherwise constitute the elements of being an accessory. However, in such circumstances his conduct is subsumed within his guilt as a principal and he may not be convicted both as a principal and as an accessory. [Citations.]" (*Id.* at p. 536, fn. omitted.) The court went on to observe that, although the intent required as an aider and abettor and the intent required as an accessory are not identical, nothing precludes an individual "from harboring those intents in succession and coupling those intents with conduct. [Citations.] Hence we find nothing illogical or inconsistent in finding that a defendant committed intentional acts that would constitute aiding and abetting and that he then committed intentional acts that would be sufficient to render him an accessory, although in such circumstances a conviction as a principal would preclude conviction as an accessory as well. [Citation.]" (*Id.* at pp. 536–537, fn. 6.)

In *In re Eduardo M.* (2006) 140 Cal.App.4th 1351 [44 Cal.Rptr.3d 875] (*Eduardo M.*), two men were walking to a store when a blue van drove up and stopped a short distance away. Someone in the van asked whether they belonged to a gang; when they said no, the person in the van shot one of them in the leg. Later, Eduardo, who knew the men, pulled up to their location in the van. When one of the men said it was the van from which the shot was fired, Eduardo denied being involved or knowing who committed the assault, and said someone had carjacked the van, which he had just gotten

back. He initially repeated his story to the police, but later conceded that he had been driving the van with two passengers, one of whom was the shooter. Eduardo admitted knowing his passenger was armed, but claimed he did not know the man intended to shoot anyone. The juvenile court found that Eduardo assaulted both victims by aiding and abetting the shooter, and also that he was an accessory to the same crime. (*Id.* at pp. 1356–1357.) On appeal, Eduardo contended that his accessory conviction had to be reversed and dismissed since he was convicted as a principal of the assaults. The appellate court agreed, stating: "We hold that because Eduardo was convicted as a principal in both assaults, he cannot also be convicted as an accessory to those assaults solely on the basis of his immediate flight from the scene of the crime and his subsequent denials of his own involvement, even if that conduct incidentally helped a coprincipal to escape." (*Id.* at p. 1357.) In so holding, the court declined to resolve the conflict in California case authority concerning whether a person can be convicted as both a principal and an accessory to the same felony. (*Id.* at p. 1359.)

After reviewing the foregoing authorities, we conclude that those which eschew or limit *Prado* are the better reasoned, and that being a principal in a crime and being an accessory to that crime are not mutually exclusive offenses as a matter of law. Accordingly, imposition of liability for both may be permissible, depending upon the particular circumstances of a specific case. With respect to the present case, we further concur with respondent's claim that counts 1 and 4 were based on factually separate conduct that went beyond mere flight and denial of involvement; hence, *Eduardo M.* is not controlling.

We do not agree, however, that this means both counts can stand. The present case contains a variation that renders it distinguishable from those in which imposition of dual liability was upheld. In each of those cases, the appellate court specifically noted that, at the time the defendant committed the conduct upon which accessory liability was predicated, the felony in which the defendant was a principal was *completed*. (See, e.g., *People v. Wallin, supra*, 32 Cal.2d at p. 807; *People v. Riley, supra*, 20 Cal.App.4th at pp. 1815–1817; *People v. Mouton, supra*, 15 Cal.App.4th at p. 1324.) Here, by contrast, Hakkim's possession of the assault rifle was a continuing offense that extended throughout the entire time he asserted dominion and control over that weapon. (See *People v. Bland* (1995) 10 Cal.4th 991, 999 [43 Cal.Rptr.2d 77, 898 P.2d 391] [drug possession].) Although Hakkim may have committed a violation of section 12280, subdivision (b), at the moment he asserted dominion and control over the weapon, so that he could be found guilty of possession as opposed merely to attempted possession (see *People v. Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742]; *People v. Spirlin* (2000) 81 Cal.App.4th 119, 130 [97 Cal.Rptr.2d 1]), the felony of possessing an assault weapon in violation of section 12280,

subdivision (b) had not been "completed" for purposes of section 32, which assigns liability to persons who engage in certain conduct, while harboring particular knowledge and intent, *"after* a felony has been committed . . . ." (§ 32, italics added.) At the time Malcolm placed his feet over the barrel of the weapon, the felony being committed by Hakkim was still in progress. Because the crime was still in progress, Malcolm's presumable purpose of helping Hakkim avoid arrest for possession was subsumed within, and was not separable from, his purpose of facilitating Hakkim's commission of the offense, and his act aided Hakkim in his criminal endeavor. Accordingly, he aided and abetted Hakkim's continued felonious possession of the weapon. (See *People v. Marshall, supra*, 15 Cal.4th at p. 40; *People v. Beeman, supra*, 35 Cal.3d at p. 561.)

*People v. Cooper, supra*, 53 Cal.3d 1158, is instructive. In that case, the California Supreme Court was called upon to determine whether the getaway driver in a robbery could be convicted of aiding and abetting the robbery, as opposed merely to being an accessory after the fact, if the jury found that he did not form the requisite intent to facilitate or encourage commission of the robbery prior to the robbers' flight with the stolen property. (*Id.* at p. 1160.) The court stated: "As our cases recognize, the prosecution must show an aider and abettor intended to facilitate or encourage the principal offense prior to or during its commission. The main issue here, therefore, is the duration of the commission of a robbery for purposes of determining whether a getaway driver is liable as an aider and abettor rather than an accessory. [¶] We conclude that *the commission of a robbery for purposes of determining aider and abettor liability continues until all acts constituting the robbery have ceased.* The asportation, the final element of the offense of robbery, continues so long as the stolen property is being carried away to a place of temporary safety. Accordingly, in order to be held liable as an aider and abettor, the requisite intent to aid and abet must be formed before or during such carrying away of the loot to a place of temporary safety. Therefore, a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." (*Id.* at p. 1160–1161, original italics omitted, italics added.) In discussing the difference between when a crime is "committed," so that the principal may be found guilty of the crime itself and not merely an attempt, and the "commission" of a crime, for purposes of formation of the requisite intent to aid and abet such that the defendant may be deemed a principal, the court explained: "The logic of viewing 'committed' as a fixed point in time for purposes of guilt-establishment and 'commission' as a temporal continuum for purposes of determining accomplice liability can be seen from the perspectives of both the victim and the accomplice. The rape victim, for example, would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial penetration). Rather, the offense does not end until all of the acts that

constitute the rape have ceased. Furthermore, the unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts is an accomplice under this concept of 'commission,' because he formed his intent to facilitate the commission of the rape *during its commission*." (*Id.* at p. 1164 & fn. 7.)

■ From the foregoing, we distill the rule that, in order to find someone to be an accessory after the fact to a felony in the commission of which the person is also a principal by virtue of his or her having aided and abetted its commission, the acts constituting that felony must have ceased at the time of the conduct that violates section 32. Otherwise, the conduct of aiding or concealing a principal with the intent that he or she avoid arrest (§ 32) is subsumed into the conduct of aiding the commission of the crime with the intent or purpose of facilitating commission of the offense (*People v. Beeman, supra,* 35 Cal.3d at p. 561), such that the defendant is "concerned in the commission of a crime" (§ 31) and is therefore a principal in its commission (see *People v. Nguyen, supra,* 21 Cal.App.4th at p. 536). This is because an intent to help the perpetrator get away, formed before cessation of the acts constituting the felony, constitutes aiding and abetting. (See *People v. Cooper, supra,* 53 Cal.3d at pp. 1164–1165.) Since the assault rifle remained in Hakkim's immediate presence, and under his dominion and control, both when he and Malcolm got out of the vehicle on Strother and when Malcolm attempted to conceal the weapon after being stopped by the police, the acts constituting the felony possession had not ceased at the time of Malcolm's second act. Accordingly, the conduct by Malcolm that formed the basis for *both* counts 1 and 4 constituted aiding and abetting, thus rendering him a principal in the unlawful possession of the assault weapon. (See *People v. Marshall, supra,* 15 Cal.4th at p. 40; *People v. Nguyen, supra,* 21 Cal.App.4th at p. 536.) Under the circumstances, he could not properly also be found liable as an accessory to that offense. (*People v. Nguyen, supra,* at p. 536.) The true finding on count 4 cannot stand.

## II[*]

## IMPOSITION OF LIABILITY UNDER SECTION 186.22

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*] See footnote, *ante,* page 157.

## DISPOSITION

The judgment (order) of the juvenile court is affirmed insofar as it sustains the allegation of count 1, that Malcolm violated section 12280, subdivision (b). The remainder of the judgment is reversed, and the matter is remanded for proceedings consistent with this opinion.

Vartabedian, J., and Levy, J., concurred.