Filed 6/12/23 P. v. Thompson CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078600 |
| v. | (Super.Ct.No. RCR11884) |
| JEFFREY LEROY THOMPSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Mary E. Fuller, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Sally Patrone Brajevich, by appointment of the Court of Appeal, for Defendant and Appellant.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, Daniel J. Hilton and Elizabeth Renner, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

In May 1986, the body of R.A. was found in a small storage room of the gas station where he worked as an attendant. After a jury trial, defendant and appellant Jeffrey Thompson was convicted of first degree felony murder of R.A. (Pen. Code, § 189),[1] robbery (§ 211), and being an accessory after the fact to the murder (§ 32). The trial court sentenced defendant to 25 years to life in state prison, and this court affirmed the judgment on direct appeal in 1989. (*People v. Thompson* (Sept. 12, 1989) E004443 [nonpub. opn.].) In August 2020, defendant filed a petition for resentencing pursuant to section 1172.6.[2] The trial court held an evidentiary hearing and denied the petition, finding that defendant was ineligible for resentencing because the evidence showed defendant was a major participant in the underlying crime who acted with reckless indifference to human life.

Defendant appeals from the order denying his petition for resentencing, arguing (1) the trial court erred because relief was mandatory under section 1172.6, subdivision

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant brought his petition under former section 1170.95, which was renumbered as section 1172.6 without substantive change on June 30, 2022. (Stats. 2022, ch. 58, § 10.) As such, we refer to the statute by its current number throughout this opinion whenever possible.

(d)(2), as the result of a purported prior jury verdict of acquittal on charges of premeditated first degree murder, second degree murder, and voluntary manslaughter; (2) the trial court erred by making factual findings contrary to the jury's purported verdict of acquittal; and (3) the trial court's finding that defendant was a major participant in the underlying felony who acted with reckless indifference to human life is not supported by substantial evidence. As we explain, the record does not support defendant's characterization that he was acquitted on charges of first degree murder, second degree murder, or voluntary manslaughter and, as such, the arguments based upon this premise are not grounds for reversal. With respect to the remaining issue, we conclude that substantial evidence in the record supports the trial court's factual findings and affirm the order.

## II. FACTS & PROCEDURAL HISTORY

A. *Facts and Charges*

In the early morning of May 19, 1986, police were dispatched to a gas station in the City of Upland. Customers at the station had discovered a body in a storage room while searching for the station attendant. The body belonged to R.A., who was the attendant scheduled to work the graveyard shift that morning. Following the incident, the station managers were also unable to account for approximately $117 worth of gasoline, packs of cigarettes, cash, some lottery tickets, and a set of keys. As a result of this incident, defendant, Ronald Crutcher (Crutcher), and Darrell Barclay (Barclay) were charged with one count of murder (§ 187, count 1) and one count of robbery (§ 211, count 2).

3

B. *Relevant Evidence at Trial*[3]

### 1. Evidence Regarding Station Operations

The building where the victim's body was found housed an office, lube bays, and a small back storage room. The lube bays were not in use at the time of the incident. One has to enter through the station office and walk through the lube bays in order to access the storage room. The storage room contained a wash basin for washing hands and stored cleaning supplies.

Typically, the station had only one attendant assigned to work each shift. The station accepted both cash and credit card payments from customers. Cash would be kept in a locked cash drawer as well as a floor safe, which were both located in the station office. The floor safe is a double compartment safe with a door separating an upper compartment from a lower compartment. The upper compartment was equipped with a dial lock, which was never locked. The lower compartment was secured with a keyed lock but had a small slit that permitted employees to drop envelopes of cash into the compartment. The attendants who worked at the station had access to the unlocked upper compartment but were not supposed to have keys to the lower compartment.

The station's policy was to keep approximately $50 in cash in the cash drawer at the beginning of each shift, as well as $42.50 in the upper compartment of the floor safe

---

[3] Because defendant challenges only the sufficiency of the evidence to support the trial court's finding that he was a major participant who acted with reckless indifference to human life in the commission of a robbery, we summarize only the evidence relevant to this issue.

in case an attendant needed extra cash to make change. Throughout a shift, attendants were supposed to place excess cash into envelopes and drop the envelopes into the lower compartment of the floor safe.

During a shift change, the attendant on duty would take an inventory, ensure excess cash was dropped into the secure portion of the floor safe, and hand over a set of keys to the attendant scheduled to take the next shift. The attendant's station keys were kept on a large two-inch diameter key ring with a clasp or hook for wearing it along a belt loop. The keys included a key to the gas pumps, a key to the cash drawer, and a key used to replace paper towels in the bathroom. Every employee who worked at the station knew that only one attendant held the keys to the cash drawer at any given time. During the graveyard shift, business would be slow between midnight and approximately 5:00 a.m. in the morning.

2. <u>Witness Testimony</u>

*a. Testimony of Defendant's social acquaintances*

Defendant, Crutcher, and Barclay were regular customers at a local pizza parlor. Two witnesses testified that they were also regular customers at the same pizza parlor and were socially acquainted with defendant, Crutcher, and Barclay. The first witness recalled encountering defendant, Crutcher, and Barclay at the pizza parlor on the evening of May 18, 1986; that all three expressed their intent to travel out of state; and that, during this conversation, both defendant and Crutcher handled a switchblade knife. The witness recalled that he had seen defendant handle the same switchblade knife on previous occasions and also recalled seeing Crutcher handle a pistol on a prior occasion.

5

The second witness testified that: she interacted with the three men at the pizza parlor on the evening of May 18, 1986; the three expressed their intent to travel out of state; defendant was handling a switchblade knife during their conversation; and Crutcher briefly pulled a revolver out of his pants pocket during this conversation. Later that evening, while talking with the three men in the parking lot of the pizza parlor, Barclay pulled a revolver out and pointed it at her. Defendant intervened and told Barclay that it "wasn't funny." The witness saw defendant, Crutcher, and Barclay leave the parking lot together in the same vehicle and followed the men in her own vehicle to the station where the murder occurred. While at the station, she saw all three men enter the station office together. Eventually, they exited the station office and left the station upon seeing a police officer pass by the station. The witness left separately in her own vehicle around the same time.

### b. Testimony of station employees

The station's manager and two former station employees testified that defendant had been employed as an attendant at the station. According to the station's manager, defendant had been terminated from employment a few days prior to the murder. The two station employees recalled separate occasions in which defendant returned to the station after his employment had been terminated, appeared frustrated, and expressed an intent to return to the station to rob the station and physically harm the manager.[4]

---

[4] On one occasion, defendant stated that he intended to rob the station and "break [the manager's] nose." On the second occasion, defendant stated that he would "get even" with the station manager.

6

However, neither employee believed that defendant was serious when making these comments.

The station attendant assigned to work the swing shift on the night of the murder recalled seeing defendant, Crutcher, and Barclay visit the station together on two occasions during his shift. Around 10:30 p.m., the men stopped at the station to get gas for their vehicle and purchase sodas. Approximately one hour later, the three men again visited the station and entered the station office to purchase cigarettes. The attendant became nervous because the men continued to linger in the station office while other customers were present, asked everyone to leave the office, and saw the men leave the station shortly after. The victim arrived to take over the next shift, and the swing-shift attendant left the station around 12:15 a.m. The swing-shift attendant recalled that when he left, the victim was alone at the station.

### c. Testimony of station customers

A limousine driver testified that in May 1986, he frequented the station as a regular customer almost every night. He personally encountered defendant on many occasions since defendant had been an attendant at the station. In the early morning of May 19, the limousine driver stopped at the station to purchase gas, and defendant came out to assist him with his purchase. The driver did not see any other attendant on duty at the time and did not notice anything unusual about the way defendant assisted him with his purchase. The driver paid for his gas with a credit card and his receipt showed that the payment was processed around 2:04 a.m. As the driver prepared to leave the station,

7

he approached the office to wave goodbye to defendant, but he did not see defendant in the office.

C.R. testified that she stopped at the station around 3:00 a.m. on the morning of May 19, 1986. When she arrived, she noticed a man standing next to a truck parked at the station and a second man standing at the doorway of the station's office. She went to locate the gas station attendant, but she was told by the man standing at the office door that the attendant "was not there" and had "taken a break." She recalled the television inside the office had its volume turned up very high, the man at the door was very rude, and the man did not want to speak with her. C.R. testified that defendant looked "very much like" the man she encountered standing at the doorway of the station office.

L.S. testified that he was a regular customer at the station. In the early morning of May 19, 1986, he stopped at the station to get gas on his way to work. When he arrived, he noticed that one of the pumps was out of place. After pumping gas, L.S. could not locate any attendant at the station. He went to the station office and noticed that the office appeared disorganized with a drawer that appeared partially open. L.S. became concerned and went to a gas station across the street to ask the attendant at that station to call the police. He left the area because he was scheduled to report to work at 4:21 a.m., but he contacted the police himself after his work day ended to report the incident.

Two employees of a sweeping company testified that they were regular customers at the station. Their jobs involved driving a sweeper truck to commercial locations, sweeping the parking lots of these locations, and then returning the sweeper truck to a central warehouse located close to the gas station. The first employee testified that he

8

stopped at the station in the early morning of May 19, 1986, to pump gas into his sweeper truck before returning it to the central warehouse. He did not see anyone at the station when he arrived, proceeded to pump gas, and then stood outside the window of the station office to wait for the attendant.

As the first sweeping employee was waiting for the attendant, a second sweeping employee arrived to fill gas into his sweeper truck on the way back to the central warehouse. When the first employee commented that he had yet to see the attendant, the two went looking for the station attendant. The second sweeping employee discovered the victim's body inside the storage room of the station and called the police.

3. Forensic Evidence

The victim's body was found lying in a pool of blood. His hands were tied behind his back, a gag had been placed in his mouth, and a wire ligature was wrapped around his neck. The victim sustained two stab wounds to the side of his neck and a slicing injury along the back of his neck. His head also displayed multiple wounds consistent with blunt force trauma. A bloody footprint appeared on the victim's body and footprints from two different sets of shoes appeared in the blood around the victim's body.

A few days after the incident, defendant, Crutcher, and Barclay were arrested in Texas. The three men were discovered traveling together in the same vehicle. At the time, Barclay had a knife in his pants pocket, as well as blood on his shoes and pants, which was consistent with the victim's blood type. Crutcher also had blood on his jeans, shirt, and sneakers consistent with the victim's blood type. Additionally, Crutcher had a

9

switchblade in his pants pocket that also bore blood consistent with the victim's blood type.

There was no blood discovered on the clothing or shoes worn by defendant at the time of his arrest. However, investigators searched the vehicle the three men had been traveling in and located a third set of shoes with blood stains consistent with the victim's blood type. Authorities also located a set of black gloves in the vehicle that had blood consistent with the victim's blood type.

## C. *Verdict, Sentence, and Postjudgment Procedures*

The jury was instructed on theories of felony murder, premeditated first degree murder, second degree murder, voluntary manslaughter, and being an accessory after the fact as a related offense to murder. The jury was further provided with separate verdict forms corresponding with each of these theories. Finally, the trial court instructed the jury that it could return two possible verdict forms on count 1 and that if the jury unanimously agreed on two such verdicts, "the corresponding forms [were] the only verdict forms to be signed as to count [1]."

The jury returned verdicts finding defendant guilty of felony murder and guilty of being an accessory after the fact on count 1. No parties objected to the instructions or the verdicts on the basis that they were incomplete, and the jurors were excused. Defendant was sentenced to a term of 25 years to life, and this court affirmed the judgment on direct appeal.

On August 28, 2020, defendant filed a petition for resentencing pursuant to section 1172.6.[5] The trial court issued an order to show cause on the petition, held an evidentiary hearing, and denied defendant's petition. In doing so, the trial court found that defendant was ineligible for resentencing because the evidence in the record showed he was a major participant in the underlying crime who acted with reckless indifference to human life. Defendant appeals from the order denying his petition for resentencing.

## III. DISCUSSION

On appeal, defendant argues the trial court erred in denying his petition for resentencing because (1) relief was mandatory under section 1172.6, subdivision (d)(2), because the jury acquitted him on charges of first degree murder, second degree murder, and voluntary manslaughter; (2) the trial court's factual findings following the evidentiary hearing on his petition for resentencing are contrary to the jury's purported verdict of acquittal; and (3) there was insufficient evidence to support the trial court's factual findings that defendant was a major participant in the underlying offense who acted with reckless indifference to human life. As we explain, the record does not support defendant's characterization that he was acquitted on theories of first degree murder, second degree murder, or voluntary manslaughter and, as such, defendant's arguments premised on the existence of a verdict of acquittal are not grounds for reversal.

---

[5] Defendant initially filed a petition for resentencing in 2019, which the trial court denied without prejudice. However, on appeal from that order, this court reversed and remanded the matter for reconsideration. (*People v. Thompson* (Oct. 14, 2020) E072819 [nonpub. opn.].) Upon remand, defendant refiled his petition for resentencing.

We also conclude that substantial evidence in the record supports the trial court's factual findings and affirm the order.

A. *Legal Background*

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.] . . . Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' " (*Lewis*, *supra*, 11 Cal.5th at pp. 959-960.)

"Where the petition complies with section 1170.95, subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner

12

has made a 'prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts. . . . 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' " (*Lewis*, *supra*, 11 Cal.5th at p. 960.) If, based upon this evidence, the trial court finds that the defendant was the actual killer, acted with the intent to kill, or was a major participant in the underlying felony who acted with reckless indifference to human life, then resentencing under section 1176.2 is unavailable. (*People v. Strong* (2022) 13 Cal.5th 698, 710.)

B. *Record Does Not Support Defendant's Characterization Re Acquittal*

In this appeal, defendant argues the trial court erred because it was required to grant him relief under section 1172.6, subdivision (d)(2), or alternatively, that the trial court erred by making factual findings contrary to the jury's verdict at the time of trial. Both of these arguments rest upon defendant's characterization of the jury's verdict as a verdict of acquittal on charges of first-degree premeditated murder, second degree murder, and voluntary manslaughter. However, as we explain, the record does not support defendant's characterization of the jury's verdict as a verdict of acquittal.

Under section 1172.6, subdivision (d)(2), "[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." Further, "on a resentencing petition, the trial court may not

13

make an eligibility determination contrary to the jury's verdict and findings" when based upon review of the "same evidence the jury considered." (*People v. Cooper* (2022) 77 Cal.App.5th 393, 415-416.) The question of whether a prior verdict has preclusive effect is an issue of law that we independently review. (*Id.* at p. 412; *People v. Sanchez* (2020) 49 Cal.App.5th 961, 976 ["court's legal determination on the question of former jeopardy is a question of law that we review de novo"].)

Contrary to defendant's assertion on appeal, the record does not include a verdict acquitting defendant on charges of premeditated first degree murder, second degree murder, or voluntary manslaughter.[6] Instead, with respect to count 1, the jury returned a verdict finding defendant guilty on a theory of felony murder and guilty of being an accessory after the fact to murder. Neither of these verdicts constitutes an acquittal with respect to the alternate theory of premeditated first degree murder or the lesser included offenses of second degree murder or voluntary manslaughter. (*People v. Friend* (2009) 47 Cal.4th 1, 74 [Where the jury is instructed to return a verdict on only one theory of murder, a conviction based upon that theory does not constitute a finding rejecting alternative theories.]; *People v. Riley* (1993) 20 Cal.App.4th 1808, 1813 [A conviction as an accessory after the fact does not operate as an implied acquittal of the principal offense.]; *In re Malcolm M.* (2007) 147 Cal.App.4th 157, 169 ["[B]eing a principal in a crime and being an accessory to that crime are not mutually exclusive offenses . . . ."];

---

[6] Notably, even after the People raised this point in the respondent's brief, defendant failed to direct our attention to anything in the record that would constitute a verdict of acquittal in reply.

*People v. Bacon* (2010) 50 Cal.4th 1082, 1115, fn. 9 ["[A] defendant can be convicted as both a principal and an accessory to the same crime."].)

Nor do we believe it is appropriate to interpret the absence of a verdict addressing the issue of premeditated first degree murder or the lesser included offenses of second degree murder and voluntary manslaughter as a prior finding for purposes of a petition for resentencing under section 1172.6. The type of prior finding described in section 1172.6 must "be the type of finding that challenges whether the People have demonstrated guilt beyond a reasonable doubt." (*People v. Nieber* (2022) 82 Cal.App.5th 458, 473.) Yet here, at defendant's request, the jury was instructed on the issue of accessory after the fact as a related, but separate, offense with distinct elements.[7] The jury was further instructed to return only two verdicts with respect to count 1 and further instructed that if there was unanimous agreement on two verdicts, the jury need not return any other verdict forms on count 1. Thus, it is entirely possible the jury reached a unanimous agreement on the issue of felony murder and accessory after the fact without ever reaching the question of whether defendant might also be guilty of premeditated first degree murder or its lesser included offenses. The absence of a verdict on the issue thus cannot operate as a prior finding within the meaning of section 1172.6.

---

[7] In contrast, the trial court specifically instructed that if the jury unanimously agreed defendant was guilty of an unlawful killing, it was required to unanimously agree on whether that unlawful killing constituted first degree murder, second degree murder, or voluntary manslaughter. Accessory after the fact was not included as a lesser included alternative to these theories.

Because the record does not support defendant's contention that the jury rendered a verdict of acquittal on the issue of premeditated first degree murder, second degree murder, or voluntary manslaughter, we find no basis to conclude that defendant was entitled to mandatory relief under section 1172.6, subdivision (d)(2), or that the trial court's factual findings were contrary to a purported verdict of acquittal.

C. *Substantial Evidence Supports the Trial Court's Factual Findings*

Defendant's remaining contention on appeal is that the trial court erred in finding that he was a major participant in the underlying crime who acted with reckless indifference to human life. "We review the trial court's factual findings for substantial evidence," viewing the evidence " 'in the light most favorable to the prosecution and presume[ing] in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.' " (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) We conclude that substantial evidence supports the trial court's factual findings here.

1. The Trial Court Applied the Correct Standard of Proof

As an initial matter, we briefly observe that the trial court conducted the evidentiary hearing and denied defendant's petition in July 2021. However, in October, the Legislature enacted Senate Bill No. 775 (2021-2022 Reg. Sess.), which, among other things, amended then section 1170.95 to specify that the prosecution bears the burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.) As it now reads, the statute requires that, "[a]t the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall

be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended . . . ." (§ 1172.6, subd. (d)(3); Stats. 2022, ch. 58, § 10.) The statute further clarifies that "[a] finding that there is substantial evidence to support a conviction . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid.*)

Despite this statutory clarification, we are satisfied that the trial court applied the correct standard of proof when evaluating defendant's eligibility for resentencing in this case. At the prima facie hearing on defendant's petition, the trial court expressly acknowledged the fact that the standard of proof to be applied was unsettled but stated that if it were to issue an order to show cause on the petition, it would follow the line of cases holding that the trial court must determine whether defendant could be found guilty beyond a reasonable doubt under the current law.[8] Further, at the time of the order to show cause, the trial court reaffirmed this understanding, stating: "And the Court is aware of that duty I have at this hearing to determine whether or not the evidence that's presented at this hearing, . . . whether or not that establishes beyond a reasonable doubt

---

[8] Specifically, the trial court stated: "I have also been in contact with the Judge's Association's ethics committee. Because if the court orders an order to show cause hearing, the evidentiary hearing that is the next step in the 1170.95 process, the Court is asked under the current case law and the Superior Court has yet to give us the guidance on what exactly are the findings that the court has to make. But at least in looking at the cases that the Supreme Court has granted review on, there is a strong possibility that they are going to say that those cases that follow the line that the Court has to make a finding that the defendant was guilty beyond a reasonable doubt under the new felony murder rule, the major participant, reckless indifference to human life theory. [¶] Then that would be the line of cases that, if I grant the order to show cause, that I would follow."

that the defendant can be convicted under the current law today." On this record, we are satisfied that the trial court applied the appropriate standard of proof in making its findings in this case. Thus, the only issue for our consideration is whether substantial evidence supports those findings.

    2. Substantial Evidence Supports a Finding Defendant Was a Major Participant

    "To be a major participant, 'a defendant's personal involvement must be substantial, greater than the actions of *an ordinary aider and abettor* to an *ordinary felony murder . . . .*' 'The ultimate question pertaining to being a major participant is "whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " ' " (*People v. Rodriguez* (2021) 66 Cal.App.5th 749, 768-769.) "[W]hat is required is that petitioner was a major participant in a robbery known to carry a grave risk of death, not that he was a major participant in the murder." (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1092.) Factors to consider include: " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? *No one of these considerations is necessary,* nor is any one of them necessarily sufficient." (*Rodriguez,* at p. 769; see *People v. Banks* (2015) 61 Cal.4th 788, 803.)

18

Here, defendant was a former employee at the station and had previously expressed a desire to rob the station, giving rise to a reasonable inference that he played a central part in planning the robbery. As a former employee from the immediate past, defendant was aware of where the money was held, how many employees would be on duty, and the keys available to the employee on duty. The victim's body had sustained three knife wounds; witnesses testified they had seen defendant passing around a switchblade knife with a codefendant the evening of the robbery; and at least one witness testified they had seen defendant in sole possession of a similar knife in the past. Thus, the trial court could reasonably infer that defendant supplied at least one of the weapons ultimately used to inflict lethal force on the victim.

A witness testified that, on the night of the murder, defendant had to intervene when one of his codefendants pulled out a gun and pointed it at her. While defendant argues that this incident suggests defendant had an aversion towards violent conduct, an equally reasonable inference to draw from this evidence is that defendant knew that his codefendant had a tendency to act recklessly with a weapon if left unsupervised.

Contrary to defendant's characterization, substantial evidence in the record also supports an inference that he was present while the victim was being tortured. At the time of their arrest, defendant, Crutcher, and Barclay were found in possession of at least three pairs of shoes stained with blood.[9] One witness testified that defendant posed as the

_____

[9] Crutcher and Barclay were both discovered wearing blood-stained shoes at the time of their arrest. However, a third pair of blood-stained shoes was found in the truck in which the three men were traveling. There is no evidence to suggest that Crutcher or

19

station attendant[10] by taking payment for gas but then disappeared out of sight when the witness approached the office to wave goodbye. Based upon this evidence, the trial court could reasonably infer that defendant personally entered the storage room and did not merely remain outside as a lookout the entire time the victim was being tortured.

Further, the testimony established that there was nothing of value in the station storage room, yet a witness testified that defendant was outside standing at the entrance to the station office nearly an hour after posing as the station attendant and disappearing from the office. Thus, even if defendant did not initially have knowledge that his coparticipants might have violent intentions, it is reasonable to infer that defendant must have eventually realized his coparticipants were no longer engaged in a mere robbery and that defendant decided to further facilitate, instead of prevent, their actions.

Our review of the record reveals substantial evidence that would support a conclusion that substantial evidence supports the finding that defendant was a major participant in the underlying offense. Thus, we conclude that the trial court did not err in making this finding.

---

Barclay ever left the storage room to change shoes during the murder and, as such, it is reasonable to conclude that the third set of shoes belonged to defendant.

[10] Defendant served the customer notwithstanding the fact that he no longer worked at the station.

3. Substantial Evidence Supports a Finding Defendant Acted with Reckless Indifference to Human Life

"To determine whether a defendant acted with reckless indifference to human life, we 'look to whether a defendant has " 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " [Citation.]' [Citation.] 'The defendant must be aware of and willingly involved in the violent manner in which a particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create.' " (*People v. Saibu* (2022) 81 Cal.App.5th 709, 739-740.) Factors to consider include (1) the defendant's knowledge, and use, of weapons, and the number of weapons used in the commission of the crime; (2) the defendant's physical presence at the crime scene such that he or she had opportunities to limit the crime or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of his or her coparticipants' likelihood of killing; and (5) whether defendant made any efforts to minimize the risk of violence. (*People v. Clark* (2016) 63 Cal.4th 522, 618-622 (*Clark*); *Saibu*, at p. 740.) There is "significant overlap" between the element of being a major participant and having reckless indifference to human life (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1015 (*Bennett*)) and, as we explain, much of the same evidence leads us to conclude that the trial court's finding that defendant acted with reckless indifference to human life is also supported by substantial evidence.

As we have already detailed, the evidence showed that defendant knew his coparticipants were in possession of both a knife and a gun at the time of the robbery and that defendant supplied the very knife used in the murder. The evidence also gave rise to

21

a reasonable inference that defendant was not only present at the gas station but physically entered the very room where the victim was murdered, since a witnesses testified that defendant disappeared from the station office after posing as the station attendant and blood stains were found on three different sets of shoes at the time the defendants were arrested. Additionally, witness testimony established that defendant remained at the station for more than one hour after the victim had already been taken into the back storage room. Thus, substantial evidence supports a conclusion that the first three *Clark* factors all weigh in favor of finding defendant acted with reckless indifference.

With respect to the fourth *Clark* factor, we acknowledge that the evidence gives rise to competing inferences. A witness testified that defendant had to intervene when a codefendant pulled out a gun and pointed it at her on the evening of the murder. While this evidence could support an inference that defendant had no intention to use violence, a trier of fact could also rely on this testimony to reasonably infer that defendant knew his coparticipant had a tendency to handle weapons in a reckless and dangerous manner if left unchecked. On review for substantial evidence, it is not our role to decide which inference should have been drawn by the trier of fact. (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298 ["[I]f the circumstances and reasonable inferences justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment."]; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) It is sufficient that this evidence permitted the trial court to reasonably infer that defendant had knowledge of a

22

coparticipant's violent tendencies and to conclude that the fourth *Clark* factor weighed in favor of finding defendant acted with reckless indifference to human life.

Finally, with respect to the fifth *Clark* factor, the witness testimony showed that nothing of value was stored in the back storage room; everything of value would have been located in the station office, and access to the items of value in the office could be obtained simply by unclipping a key chain worn around the victim's belt. It is reasonable to infer that as a former employee, defendant was aware of where the items of value in the station would be located and how to access these items. Yet the witness testimony showed that defendant had already gained access to the station office when he posed as a station attendant, permitted his coparticipants to remain in the back storage room with the victim for more than an hour even after gaining access to the station office, and took active efforts to deter patrons from discovering what was happening in the storage room. Given this evidence, the trial court was not required to accept defendant's characterization that he "believed it was just a robbery, and was unaware of the need to intercede to prevent [the victim's] death." A trier of fact could clearly infer from this evidence that: a mere robbery would not have required defendant's coparticipants to remain in a back storage room with the victim for more than an hour; based upon his prior knowledge of the station's operations, defendant must have known that his coparticipants actions served no purpose related to completing a robbery; and defendant

23

nevertheless took active efforts to facilitate his coparticipants' actions over the course of an hour instead of making efforts to limit those actions or aid the victim.[11]

Thus, substantial evidence in the record supports the conclusion that all of the *Clark* factors weighed in favor of finding that defendant acted with reckless indifference to human life. As such, the trial court did not err in making this finding, and we decline to reverse the trial court's order on this basis.

---

[11] For this reason, we are unpersuaded by defendant's attempt to analogize the facts of this case to those present in *Clark*, *supra*, 63 Cal.4th 522; *In re Scoggins* (2020) 9 Cal.5th 667; or *Bennett*, *supra*, 26 Cal.App.5th 1002. In each of these cases, the defendant was not in a position to ascertain that a coparticipant had deviated from a previously agreed upon plan and was not in a position to intervene to stop a coparticipant's deviation from the plan. (*Clark*, at pp. 619-620 [defendant did not "have an opportunity to observe [a coparticipant's] response to [the victim's] unanticipated appearance or to intervene to prevent her killing"]; *In re Scoggins*, at pp. 678-679 [evidence suggested the defendant was "unaware in real time" that his coparticipant "was deviating from the original plan"]; *Bennett*, *supra*, at p. 1023 [the defendant " 'did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance' "].) In contrast, the evidence here gives rise to a strong inference that, even if the original plan had simply been to rob the station, defendant was in a position to realize that his coparticipants had significantly deviated from that plan; he was also in a position to intervene but instead actively chose to facilitate his coparticipants' deviation from the plan.

## IV.  DISPOSITION

The order denying defendant's petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

MILLER _____
               Acting P. J.


RAPHAEL _____
               J.