[No. E011269. Fourth Dist., Div. Two. Dec. 16, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK DEWAYNE RILEY, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V, VI, VII and VIII.

## COUNSEL

Steven A. Schutte, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, John Swan, Warren P. Robinson and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DABNEY, Acting P. J.**—Defendant Jack Dewayne Riley appeals his convictions of second degree murder and accessory after the fact to the murder. We conclude that defendant's contentions on appeal are without merit, and affirm.

### FACTS

On the night of June 11, 1991, Carol Romine was working as a prostitute. Scott Hayden, riding a motorcycle, approached Romine; Romine agreed to a sexual act in exchange for $40. Romine and Hayden retired to Romine's motel room, where Hayden gave Romine the $40 and they engaged in the agreed-upon sexual act.

Hayden afterward produced a pistol from his duffel bag, held the gun to Romine's head, and demanded his money back. Romine gave Hayden the $40.

Michael Rowe, Romine's boyfriend, was in another room of the motel and happened to observe Hayden holding the gun to Romine's head. Rowe, with the aid of a friend, accosted Hayden as Hayden was leaving Romine's room. Rowe put his hand in Hayden's back and told him to "freeze." Hayden dropped his duffel bag and put his hands in the air. Romine came out of her room, yelling that she had been robbed; Rowe told someone to call the police. Hayden said he was not waiting for the police. Rowe retrieved the $40 from Hayden's pocket as Hayden mounted his motorcycle and left. In a loud, angry voice, Hayden vowed to return. Fearing Hayden, Rowe and Romine moved to a different motel room, in possession of the $40 and Hayden's duffel bag. Hayden's gun was inside the duffel bag.

Hayden returned about 30 to 45 minutes later, riding as a passenger with defendant in defendant's truck. Defendant drove slowly around the motel parking lot. The victim, David Woods, was in the parking lot with some other motel residents. Defendant stopped the truck and Hayden fired two gunshots out the driver's window. Woods fell down. After a few seconds' pause, several more shots were fired toward Woods. Witnesses observed defendant's truck drive slowly in the parking lot, exit, make a U-turn, and drive once more slowly past the motel. Woods was struck by a bullet that entered the shoulder area and exited his chest. He died in the motel parking lot.

The next day, defendant gave a gun to Lewis Rivenbark, defendant's business partner, for safekeeping. Defendant bragged that the gun had been

used in a killing. When police later recovered the gun, they determined that the gun was used to fire a bullet found at the scene of the killing.

When defendant was arrested, he gave a videotaped statement to police. At first, defendant denied knowing about or being present at the shooting at the motel. Defendant claimed to have been at home all evening. When police told defendant that defendant's girlfriend failed to confirm his alibi, defendant changed his story.

Defendant told police he had come home very drunk. Hayden came to defendant's house and told him he had been robbed after patronizing a prostitute. Hayden's bag and gun were taken. Defendant suggested that they go in his truck to the motel, to try to get Hayden's possessions back. Defendant gave Hayden a .357 pistol and a speed loader.

Defendant drove Hayden back to the motel in defendant's truck. Hayden saw a Black man, and told defendant the man had been involved in the robbery. Hayden leaned across defendant and yelled, "Hey, Nigger," out the window. Hayden, still leaning across defendant's body, rapidly fired several shots out of the driver's side window. Defendant said he did not realize Hayden was going to shoot anyone and he drove quickly away after Hayden fired the shots. Defendant did not know for sure if Hayden's shots had struck anyone. Defendant told police he had thrown the pistol away in the bottom of a lake.

Defendant testified in his own behalf at trial. He claimed he had been drinking all afternoon on the day of the shooting. That night, Hayden came to defendant's house, saying he had been robbed by three Black men. Defendant asked Hayden if he wanted to go back to the motel; Hayden said he did not want to go on his motorcycle because it would be recognized. He asked defendant to drive him to the motel, and defendant agreed. Defendant also lent Hayden a loaded revolver, and a speed loader with five more bullets.

On the way back to the motel, Hayden for the first time told defendant about the circumstances of the robbery; i.e., that Hayden had first held his gun to the prostitute's head. Defendant knew that Hayden had boasted before that he had once shot someone who robbed him. Defendant testified that, when they arrived at the motel, defendant told Hayden he would not get out of the truck and that they should go home and call the police. Defendant claimed that he did not know Hayden was going to shoot anyone, and he was surprised when Hayden started firing out of the driver's window. Defendant drove immediately away. Defendant told his girlfriend to say that defendant

had not left the house that evening. The next day, defendant gave the gun to Rivenbark; Rivenbark was supposed to throw the gun in a lake. When defendant later learned that Rivenbark had not disposed of the gun, defendant's lawyer contacted police and told them where they could find the gun.

A witness who was present at the motel testified that he saw Hayden, in the passenger seat, fire the shots at Woods. Defendant was leaning back while Hayden was shooting.

In rebuttal, a police officer testified that defendant told him that, when Hayden came to defendant's house on the night of the shooting, Hayden was very angry about having been robbed.

## TRIAL PROCEEDINGS

Defendant, together with Hayden, was charged in count 1 with the murder of David Woods. (Pen. Code, § 187, subd. (a).) Count 1 also alleged that a principal to the offense was armed with a firearm under Penal Code section 12022, subdivision (a)(1). Count 2 alleged that defendant was an accessory after the fact with respect to the murder (Pen. Code, § 32), and count 3 charged both defendant and Hayden with shooting at an inhabited dwelling in violation of Penal Code section 246, and alleged both that defendant had personally used a firearm, and that a principal was armed with a firearm in the commission of the offense (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5, 12022, subd. (a)(1)).

Jury trial commenced on March 10, 1992. Defendant's trial was severed from Hayden's. The jury found defendant not guilty of first degree murder as to count 1, but was unable to reach a verdict on second degree murder. The jury also found defendant guilty as to count 2, and acquitted him of the charge of shooting at an inhabited dwelling in count 3. The trial court declared a mistrial as to count 1, and the murder count was retried. At the second trial, a new jury found defendant guilty of second degree murder and found true the allegation that a principal was armed with a firearm in the commission of the offense.

The court sentenced defendant to a term of 15 years to life for second degree murder, plus 1 year for the firearm enhancement. The court imposed the middle term of two years on count 2, accessory after the fact, to be served concurrently. Defendant appeals.

## DISCUSSION

## I

### *Conviction of Murder and Accessory After the Fact*

Defendant's principal contention is that his conviction at the first trial of being an accessory after the fact to murder precluded retrial of the murder charge. He claims that principles of double jeopardy barred the retrial of count 1.

Defendant relies on one case which held that a person could not be convicted both as a principal of a substantive offense and as an accessory after the fact. From this he reasons that, as a matter of law, conviction as an accessory after the fact operates as an implied acquittal of the principal offense. He concludes, therefore, that the court's acceptance of a partial verdict, finding defendant guilty as an accessory, prevented his retrial on the murder count.

Defendant's argument rests entirely on the premise that being a principal to an offense and being an accessory after the fact are necessarily mutually exclusive. Defendant relies on *People* v. *Prado* (1977) 67 Cal.App.3d 267 [136 Cal.Rptr. 521], and other cases, in support of this premise.

In *People* v. *Prado, supra,* 67 Cal.App.3d 267, a codefendant was found guilty of both robbery and accessory to robbery. The court held that it was improper to convict the codefendant of both crimes, because the offenses were mutually exclusive. The court based this conclusion on cases and treatises stating that an accessory after the fact is someone who is not guilty of the crime as a principal. (*Id.* at pp. 271-273.)

As the court pointed out in *People* v. *Francis* (1982) 129 Cal.App.3d 241 [180 Cal.Rptr. 873], however, the offenses of principal and accessory, and the states of mind required to be found guilty of each, are *not* mutually exclusive. "The court in *Prado* appears to have assumed, without citation of any authority, that convictions as both principal and accessory are mutually exclusive or inconsistent, and, therefore, to have examined the admitted evidence in an effort to ascertain at which conviction, if either, the jury would have arrived if so instructed. However, the offenses of robbery and accessory to robbery, like the offenses of murder and accessory to murder as in the present case, are not mutually exclusive or inconsistent. Though the offenses are distinct and different, the elements of the crime of murder are not inconsistent with the elements of the crime of accessory to murder. One

guilty of the former is not necessarily not guilty of the latter or vice-versa." (*People* v. *Francis, supra,* 129 Cal.App.3d 241, 251-252, fn. omitted.)

Significantly, the *Prado* court itself recognized that "[t]he requisite intent to be a principal in a robbery is to permanently deprive the owner of his property. Thus, this is a *totally different and distinct state of mind* from that of the accused whose intent is to aid the robber to escape." (*People* v. *Prado, supra,* 67 Cal.App.3d at p. 273, italics added.) As the language of the *Prado* court's example itself demonstrates, there is nothing inherently or necessarily inconsistent between an intent to deprive someone of property and the intent to aid a robber to escape. Nothing prevents a person from harboring both intents; the intents are .different, and not overlapping.

Defendant's reliance on *United States* v. *Gaddis* (1976) 424 U.S. 544 [47 L.Ed.2d 222, 96 S.Ct. 1023], *Milanovich* v. *United States* (1961) 365 U.S. 551 [5 L.Ed.2d 773, 81 S.Ct. 728], and *Heflin* v. *United States* (1959) 358 U.S. 415 [3 L.Ed.2d 407, 79 S.Ct. 451], are also misplaced. *Gaddis* dealt with federal convictions of both bank robbery and receiving the proceeds of the robbery. *Milanovich* involved federal convictions of theft and receiving the same stolen property. *Heflin* involved bank robbery and possession of the same stolen property.

Each of these cases contravened the rule that a thief cannot be convicted of receiving the same property which was the subject of the theft. In such theft/receiving stolen property cases, the *very same* act and intent underlie both offenses, i.e., the taking possession (the stealing and, necessarily, the receiving) of the property. (See *People* v. *Jaramillo* (1976) 16 Cal.3d 752 [129 Cal.Rptr. 306, 548 P.2d 706].) To permit conviction and punishment for both offenses would effectively inflict multiple punishment for a single act.

The same multiple-punishment rationale appears in part to underlie the result in *People* v. *Prado, supra,* 67 Cal.App.3d 267, as the court stated that "[e]ssentially the same acts are relied upon to prove Gonzalez' participation in the robbery on the aiding and abetting theory, and to prove he was an accessory after the fact." (*Id.* at p. 274.)

Of course, as the court in *People* v. *Jaramillo, supra,* 16 Cal.3d 752, recognized, where the act of theft and the act of receiving are completely severed, "such as when the thief has disposed of the property and subsequently receives it back in a transaction separate from the original theft, conviction on both charges would be proper." (*Id.* at p. 759, fn. 8.)

Here, (unlike *Prado*) the conviction as a principal and the conviction as an accessory depend upon entirely different conduct: Defendant's acts of obtaining the gun and speed loader, giving them to a drunk and angry Hayden,

suggesting that Hayden return to the motel to retrieve his property, and driving Hayden to the motel in defendant's truck comprise the essentials of his guilt as a principal to the murder. The conviction of accessory is based on defendant's act, the following day, of attempting to dispose of the gun. This act occurred after the murder was complete.

There is therefore nothing necessarily illogical or inconsistent in finding defendant guilty of both murder and accessory to murder. If indeed there is a rule prohibiting conviction as both a principal and an accessory, it has nothing to do with double jeopardy;[1] defendant is not subjected to multiple punishments for the same conduct by these convictions, nor is a conviction of one an implied acquittal of the other.

Because there was nothing inconsistent between conviction of defendant as a principal to the murder and his conviction as an accessory after the fact, because the elements of the offenses do not overlap, and because each conviction depended upon an entirely different intent and conduct, conviction as an accessory at defendant's first trial did not act as an implied acquittal of the principal offense. The order of the convictions had no bearing on their validity. Double jeopardy thus did not bar retrial on the murder count, the facts and elements of which were entirely distinct from the accessory count, and the issues of which were not determined at the first trial.[2]

The idea that one person may not be convicted both as a principal and as an accessory after the fact is justified, if at all, on an entirely different basis.

---

[1] The prohibition of multiple punishment for a single act is one of the prongs of double jeopardy doctrine. Double jeopardy also prohibits another conviction (retrial after conviction) for the same offense, and prohibits retrial after an acquittal of the same offense. (See *United States* v. *Coke* (2d Cir. 1968) 404 F.2d 836; *Patton* v. *State of North Carolina* (4th Cir. 1967) 381 F.2d 636, cert. den. 390 U.S. 905 [19 L.Ed.2d 871, 88 S.Ct. 818].) From these basic policies are derived the familiar rules that conviction of a lesser included offense precludes prosecution for the greater (because it is impliedly an acquittal of the greater) (see *Benton* v. *Maryland* (1969) 395 U.S. 784 [23 L.Ed.2d 707, 89 S.Ct. 2056]), and conversely that conviction of the greater offense precludes a subsequent prosecution for the lesser (see Pen. Code, § 1023; cf. *Brown* v. *Ohio* (1977) 432 U.S. 161 [53 L.Ed.2d 187, 97 S.Ct. 2221] [generally, the greater offense and any lesser included offense are the same for double jeopardy purposes]). The elements of greater and of lesser included offenses necessarily overlap. Guilt of both is legally impossible. As we have seen here, however, the crime of being an accessory after the fact is not a lesser included offense of the primary offense. The elements of each offense are entirely different.

[2] In view of our determination that principles of double jeopardy were inapplicable to the retrial of the murder count (except insofar as the first jury's express acquittal of first degree murder precluded retrial of first degree murder), we need not consider defendant's additional contention that his trial counsel was incompetent for failing to raise the bar of former jeopardy as a defense at the retrial.

The court in *People* v. *Francis, supra,* 129 Cal.App.3d 241, asserted: "If, as the People here concede, a defendant may not be convicted as both a principal and as an accessory to the same offense absent exceptional circumstances, it is not because the elements of the two offenses are inconsistent, but because the Legislature, in proscribing the conduct of an accessory to a felony, did not intend to embrace such conduct of the principal felon. (Cf. *Heflin* v. *United States* [(1959)] 358 U.S. [415,] at pp. 419-420 [3 L.Ed.2d [407] at p. 410[,] [79 S.Ct. 451]]; [*People* v.] *Jaramillo* [(1976)] 16 Cal.3d [752] at p. 758.)" (*Id.* at p. 252.)

*People* v. *Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423], points out, however, that *Francis* and the cases following it have simply assumed, without deciding, that convictions as both a principal and as an accessory are precluded by legislative intent. (*People* v. *Mouton, supra,* 15 Cal.App.4th 1313, 1322, criticized on another point in *People* v. *Solis* (1993) 20 Cal.App.4th 264 [25 Cal.Rptr. 184].) We believe that uncritical acceptance of this assumption is unwarranted. We agree with the *Mouton* court, that *Prado* should be limited to its facts (i.e., to cases in which the two convictions rest on the same acts), and that "[n]othing in section 32, defining accessories, suggests the Legislature intended as a matter of law to exclude those who, having perpetrated or intentionally assisted in the commission of a felony, *then act further to harbor, conceal or aid the escape of another of the principals.*" (15 Cal.App.4th at p. 1323.) Accordingly, the defendant's conviction as an accessory in *Mouton* did not preclude retrial on the charge of murder.

■ "[T]here is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime. When a felony has been completed and a person knowingly and intentionally harbors, conceals or aids the escape of one of the felons, that person is guilty as an accessory to a felony under section 32, whatever his or her prior participation in the predicate felony. (See *People* v. *Wallin* (1948) 32 Cal.2d 803, 806-807 [197 P.2d 734] [actual killer could also be liable as accessory on theory that, after completion of the murder, she encouraged another to help her avoid arrest].)" (*People* v. *Mouton, supra,* 15 Cal.App.4th 1313, 1324.)

■ Aiding a cofelon to escape apprehension was the basis of the accessory charge in *Mouton,* but we see no logical difference between separate and further acts as an accessory, consisting of aiding the escape of another principal, and separate and further acts as an accessory, consisting of destruction of physical evidence (e.g., weapons) connected to the crime. Once the murder was completed, defendant's further acts of attempting to

dispose of the murder weapon were entirely separate and distinct, and served a further and different purpose. The imposition of separate liability for these distinct and independent actions was proper. Both convictions are affirmed.

## II-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Hollenhorst, J., and Timlin, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 31, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1808.