Filed 1/26/24  P. v. Wilson CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. BRANDEN CHARLES WILSON, Defendant and Appellant. | B320007 (Los Angeles County Super. Ct. No. NA115286) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Chestopher L. Taylor, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Branden Charles Wilson appeals from his convictions for murder, two robberies, and other related offenses, for which he received a sentence of life without the possibility of parole in addition to a determinate sentence. We agree with Wilson that under the circumstances of this case he could not be convicted as an aider and abettor and an accessory after the fact to robbery. We therefore reverse the accessory conviction. We further hold the trial court should have stayed execution of sentence on one of the robbery convictions, when that robbery was the predicate felony underlying Wilson's murder conviction.

We otherwise affirm the convictions. Any error in inadvertently providing the jury with the transcript of a witness's police interview was harmless beyond a reasonable doubt, and the trial court did not err in admitting evidence of Wilson's prior uncharged crimes.

## FACTUAL BACKGROUND

To provide context for the issues on appeal, we summarize below pertinent evidence admitted at trial. We describe additional evidence in our Discussion, *post*.

### 1. *The Travelodge robbery*

Apart from video evidence and the testimony of victims Z.C. and Z.M., the information summarized below comes from the testimony of sisters A.P. and K.P., both of whom entered into immunity agreements in exchange for their testimony.

On September 9, 2020, Wilson was staying at a Travelodge motel with Mykeel Peddycoart, A.P., K.P., and a man called "5 Meals." Wilson went by the nickname "Brando," and Peddycoart went by the nickname "20 Shots" or "BabyK20Shotz." At the time, Wilson and A.P. had been dating for two or three weeks.

2

Wilson told the group they were broke and needed to get some money. He proposed a plan to rob someone at the motel. According to Wilson's plan, Peddycoart would handle the gun, and 5 Meals would grab the items from the victim. Wilson instructed Peddycoart and 5 Meals to change their clothing in an alleyway before and after the robbery and hide the gun there as well, because "[y]ou can't bring it back unnoticed." K.P. would stand as lookout, and A.P. would stay in the room to open the door when everyone returned.

Wilson and K.P. walked around the Travelodge property and Wilson told her to identify the location of the security cameras. At some point, someone came to the motel and gave Wilson a duffel bag containing an AK-47 rifle. Wilson referred to the rifle as his "baby." A.P. testified she had seen the rifle a week or two earlier when she and Wilson drove to North Long Beach and he had picked it up.

The robbery happened that night. K.P. stood on a balcony with Wilson and watched as Peddycoart and 5 Meals approached a car in the Travelodge parking lot. Peddycoart was armed with the AK-47. The security camera footage showed two men standing at the open trunk of the car. Peddycoart and 5 Meals ran up, Peddycoart brandishing the rifle, and 5 Meals and one of the men struggled for a moment. The second man ran away and Peddycoart pursued him briefly. 5 Meals stood by the car, possibly opening the doors. Finally, Peddycoart and 5 Meals ran away.

Z.C. and Z.M. were the two victims. Z.C. testified he was hit by gunfire as he ran away. Z.M. testified the armed robber fired five or six shots. K.P. similarly testified Peddycoart fired six to eight shots. A.P. was in the motel room but heard the

shots, and testified that when Peddycoart came back to the room, he said he had shot somebody.

Peddycoart and 5 Meals changed clothes in the alley as planned, and Wilson recovered their discarded clothes from the alley. Wilson and K.P. also recovered the AK-47. A.P. saw Wilson return with a duffel bag containing both clothing and the rifle.

Back in the room, they emptied a bag taken in the robbery. According to K.P. and A.P., it appeared the bag contained drugs, including possibly methamphetamine and fentanyl. Wilson was upset that they had not obtained more, referring to the haul as "nothing" and stating they'd robbed the wrong person. Wilson talked about possibly robbing the people in the room below theirs, whom he believed had liquor and money.

## 2. *The 7-11 robbery*

### a. *Video evidence*

The jury saw the following security video evidence. The morning of September 10, 2020, the day after the Travelodge robbery, George Teamer pulled his car into a 7-11 parking lot and entered the store. A few seconds later, Wilson, Peddycoart, A.P., and K.P. walked up to the 7-11 carrying duffels and other bags, which they set down on the sidewalk outside the store. A.P. and K.P. went inside the store and waited near the counter, where Teamer also was standing. When Teamer went up to the counter, A.P. appeared to be looking at him. She exited the store, walked up to Wilson, and leaned towards him to say something into his ear.

A.P. then went back into the store as Wilson and Peddycoart spoke to one another. Peddycoart picked up one of

4

the duffels and walked around the side of the store. He walked into an alley, put on a mask, and took a rifle out of the duffel.

Inside the 7-11, Wilson came in just as Teamer was leaving. A.P., seeing Wilson, nodded towards Teamer. Wilson immediately turned around and followed Teamer out of the store.

As Teamer was about to get into his car, Wilson spoke to him from the sidewalk. Teamer paused, and Wilson walked up to him to talk further. As they spoke, Peddycoart came around the corner pointing the rifle. Wilson glanced towards Peddycoart and continued to talk to Teamer, who was turned away from Peddycoart and did not see him. Peddycoart walked up to the two men, at which point Teamer saw him and got into his car, attempting to close the door. Wilson quickly moved forward, sticking his arm over the car window into the car. When he pulled his hand out, he was holding what appeared to be a necklace. Teamer's car backed up in a semicircle and came to a halt elsewhere in the parking lot. Peddycoart and Wilson grabbed their bags from the sidewalk and ran around the corner. They went into the alley, Peddycoart grabbed the duffel he had left there, and they jogged away.

The parties stipulated Teamer died from a gunshot wound. It is not clear from our viewing of the video if or when Peddycoart fired the rifle. It appears the driver's side window broke as Teamer pulled away, but it is unclear if that was from a gunshot or Wilson struggling to keep the door open.

b.     *Other evidence*

A.P. testified when she saw Teamer in the 7-11 wearing a gold chain around his neck, she went outside to tell Wilson so he could steal it. She did not witness the robbery, but at some point realized Wilson and Peddycoart were gone, and she heard a

5

woman yelling that her boyfriend had been shot.  K.P. also testified she did not witness the robbery, but confirmed that A.P. told Wilson about Teamer's jewelry.

## PROCEDURAL HISTORY

For the events at the 7-11 on September 10, 2020, the People charged Wilson with the following:  count 1, the murder of Teamer, with the special circumstance that the killing occurred during the commission of a robbery (Pen. Code,[1] §§ 187, subd. (a), 190.2, subd. (a)(17)); count 2, second degree robbery (§ 211); count 3, shooting at an occupied vehicle (§ 246); and count 4, conspiracy to commit robbery (§ 182, subd. (a)(1)).

As to counts 1, 2, and 3, the People alleged that a principal used and discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b)–(d), (e)(1).)  As to count 4, the People alleged a principal was armed with a firearm (§ 12022, subd. (a)(2)).  The People further alleged counts 1 through 4 were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

For the events at the Travelodge on September 9, 2020, the People charged Wilson with the following:  count 5, accessory after the fact to robbery (§ 32); count 6, second degree robbery (§ 211); and count 7, conspiracy to commit robbery (§ 182, subd. (a)(1)).  Wilson was further charged with possession of a firearm by a felon (§ 29800, subd. (a)(1), count 9).[2]

---

[1]  Unspecified statutory citations are to the Penal Code.

[2]  The information did not include a count 8.

As to all counts, the People alleged Wilson had previously been convicted of two serious or violent felonies, subjecting him to sentencing under the "Three Strikes" law (§§ 667, subds. (b)–(j), 1170.12) and an enhancement under section 667, subdivision (a)(1).

Before trial, the trial court granted Wilson's motion to dismiss the gang allegations under section 186.22 on counts 1 through 4, finding insufficient evidence. The court also struck the firearm allegations as to counts 1 through 3, which applied only to gang-related crimes. After the close of evidence, at the prosecution's request the court dismissed count 3, shooting at an occupied vehicle.

The jury found Wilson guilty of the remaining counts 1, 2, 4, 5, 6, 7, 9, and found true the robbery special circumstance on count 1 and the firearm allegation on count 4.

As to the prior conviction allegations, the People elected not to proceed as to one of them, which was a juvenile offense. Wilson conceded he had suffered the other prior conviction.

The trial court sentenced Wilson to life without the possibility of parole for the murder count with the robbery special circumstance. The court further imposed a consecutive determinate sentence of 10 years, 8 months, selecting the midterm on count 2, robbery, as the principal term, doubled because of the prior strike, and adding one-third the midterms doubled on counts 5, accessory to robbery, 6, robbery, and 9, firearm possession. The court stayed sentencing on the two conspiracy counts, counts 4 and 7, pursuant to section 654, and declined to impose the enhancement under section 667, subdivision (a)(1). The court awarded credits and imposed fines and fees.

7

Wilson timely appealed.

## DISCUSSION

### A. Any Error in the Jury Receiving Inadvertently Admitted Evidence Was Harmless

Wilson contends he was prejudiced by the inadvertent admission of a transcript of K.P.'s police interview. We conclude any error was harmless beyond a reasonable doubt.

#### 1. Additional background

##### a. K.P.'s police interview

The transcript of K.P.'s police interview is over 100 pages long, and much of it is consistent with her testimony at trial. Our summary here focuses solely on information she provided at the interview that she did not provide at trial.

K.P. identified A.P.'s boyfriend as "Brando." She said he was a member of a Long Beach "African American" gang. She identified the two African American gangs in Long Beach as the "Insanes and 20s," and although she was "sure" Brando belonged to one of them, she did not know which one. Asked if K.P. had "heard [Brando] put out the 'hood's name," she said, "YTL." She did not know what YTL stood for.

Because her confederates were elsewhere in the police station while she was being interviewed, K.P. expressed concern they might hear what she was saying to the police. The interviewing detectives told her no one could hear her, and asked again if Brando was in a gang. She again said yes, and said it was either "20s or Insane." She said, "He says YTL so, YTLs could be from Insanes or he from Babies and YTLs, 20s." The

8

detectives asked again if he was "20s" and what "they call him." K.P. again said, "Brando," which she called his " 'hood name."

K.P. identified the other man at the 7-11 as her "boyfriend," whom she had started dating a week earlier. She said she called him by his " 'hood name," which was "Baby 20 Shots." She said he was from the "20s" gang, and confirmed he had "20 ink on him." The detectives asked if Baby 20 Shots "have any Steelers stuff on him," and K.P. said no, but Brando did. K.P. said she could not remember either Brando's or Baby 20 Shots's real names, because "[t]hey never say their names, they only say their 'hood names." Asked how she knew Baby 20 Shots was from the 20s gang, she said "YTL" and "tattoos."

Later in the interview, the detectives asked if K.P. thought Baby 20 Shots earned his money legitimately or illegitimately, and K.P. said, "Illegitimate." Asked how he earned his money, she said, "Obviously, I think he robs people on the street. I'm not stupid." She said something about a prior robbery he had told her about, but the transcript indicates most of it was unintelligible from the recording.

She said she first saw the AK-47 rifle the day before the Travelodge robbery. She said, "[F]or gang members, they like to show off what they have. So, I guess they were showing off that gun."

Regarding the Travelodge robbery, K.P. said Brando was the "mastermind," and "[h]e planned everything." She knew Brando and the others were going to commit a robbery "[b]ecause that's what they do."

K.P. said she was afraid to go home, because "[t]hey don't play in gangs out in Long Beach. They don't play. And once a snitch, always a snitch. You get packed out." At one point, a

detective admonished her for "hang[ing] around a bunch of 20s" committing robberies.

K.P. described driving to Palmdale prior to the robberies. On the drive, Brando and "Joseph" were talking about how they had used the AK-47 to scare another gang member. She said Brando and Joseph had robbed the person of $1,500.

Later, K.P. said she was scared of "those two," apparently referring to Brando and Baby 20 Shots. K.P. asked how many years in prison the others were facing, and the detective said at this point he was just trying to figure out the facts. K.P. said, "Facts is they murdered someone." The detective noted K.P. had said she had not witnessed the murder. K.P. said, "I didn't need to see it. They were just that crazy."

### b. Proceedings at trial

During trial, the defense requested the trial court exclude any mention of gangs, given the court's striking of the gang allegations for insufficient evidence. The court agreed gang evidence was "not needed," and expressed its "concern[ ] about the prejudicial impact to Mr. Wilson."

Later, the prosecutor stated he intended to use portions of K.P.'s interview transcript during his examination, although he would not seek to admit it into evidence. The prosecutor queried whether the transcript should be marked as an exhibit. Defense counsel stated she had no objection to marking the transcript "as long as it doesn't go into evidence." The clerk then marked the transcript as People's exhibit 7.

At the close of evidence, the prosecutor made a block request that exhibits 1 through 60 be admitted into evidence. The defense did not object and the court admitted all 60 exhibits.

10

The court instructed the jury that the items received into evidence as exhibits would be sent with them to the jury room. When this court received the trial exhibits as part of the appellate record, those exhibits included the interview transcript. We therefore presume the transcript was sent to the jury room along with the other exhibits and was available to the jury during deliberations.

## 2.    Analysis

The parties disagree as to who was responsible for the inadvertent admission of the interview transcript.  The Attorney General argues the fault is with Wilson, whose counsel failed to object to the admission of the transcript, and therefore we should deem Wilson's arguments on appeal forfeited.  Wilson argues the error was either the trial court's or the prosecutor's; alternatively, to the extent Wilson's counsel was at fault, Wilson claims ineffective assistance of counsel.

Whoever was at fault, we agree with Wilson the jury should not have received the interview transcript.  The trial court expressly ruled the jury was not to hear any evidence of Wilson's gang membership, deeming that evidence potentially prejudicial, and also unnecessary given the court's earlier striking of the gang allegations and enhancements.  The admission of the transcript, which contained many references to Wilson's gang membership, was not consistent with the court's ruling.  Further, because Wilson did not know the transcript would be admitted, he had no reason to question K.P. on cross-examination about her interview statements regarding his gang membership, her fear of reprisal from the gang, or his being "crazy" enough to commit murder.  The jury therefore received those statements without Wilson having an opportunity to address them.

11

The question then is whether the inadvertent admission of the transcript was prejudicial.  Wilson contends the error was of federal constitutional proportion.  We will assume arguendo it was, and therefore will affirm only if  "beyond a reasonable doubt . . . the error complained of did not contribute to the verdict obtained."  (*Chapman v. California* (1967) 386 U.S. 18, 24; see *People v. Clair* (1992) 2 Cal.4th 629, 669, fn. 10 [applying *Chapman* harmless error test to defendant's claimed constitutional errors stemming from jury's receipt of unredacted audiotape recording and transcript].)

Wilson argues K.P.'s statements in the transcript regarding his gang membership, her fear of gang reprisal, and that she knew he and Peddycoart had murdered Teamer because "[t]hey were just that crazy," could have affected the jury's verdict on the murder count and robbery special circumstance.  He contends there was no evidence he was the actual killer or intended to kill Teamer.  Therefore, to convict him of murder with the robbery special circumstance, the jury had to find he was a major participant in the robbery and acted with reckless disregard for human life.  (See § 189, subds. (a), (e)(3) § 190.2, subds. (a)(17)(A), (d).)

The jury thus had to determine Wilson's state of mind during the 7-11 robbery.  To be recklessly indifferent to human life, " '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and must then consciously disregard 'the significant risk of death his or her actions create.' " (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125, quoting *People v. Banks* (2015) 61 Cal.4th 788, 801.)  Merely showing an "[a]wareness of . . . the foreseeable risk of death inherent in any armed crime" is

inadequate; it must be shown the defendant "knowingly creat[ed] a 'grave risk of death' . . . . [Citation.]" (*Banks*, at p. 808.)

Wilson argues K.P.'s statements that he was a gang member, she was afraid of him and his gang, and he was "crazy" enough to commit murder could have tipped the balance against him on the question of reckless indifference. We disagree.

The trial court instructed the jury on the following nonexclusive list of factors to determine whether Wilson acted with reckless indifference: "Did the defendant know that a lethal weapon would be present during the robbery? Did the defendant know that a lethal weapon was likely to be used? Did the defendant know that a lethal weapon was used? Did the defendant know the number of weapons involved? Was the defendant near the person killed when the killing occurred? Did the defendant have an opportunity to stop the criminal killing or help the victim? Was the defendant aware of anything that would make the co-participant likely to kill? Did the defendant try to minimize the possibility of violence?"

Every one of these factors weighed against Wilson. The evidence showed that the night before the 7-11 incident, Wilson had orchestrated an armed robbery at the Travelodge. During that robbery, Peddycoart had fired repeatedly at a fleeing victim with an AK-47 rifle. Knowing Peddycoart was, as Wilson's trial counsel stated, "trigger-happy," Wilson nonetheless joined Peddycoart in another robbery attempt at the 7-11 in which Peddycoart once again was armed with the AK-47. When the victim, Teamer, attempted to flee in his car, Wilson made no attempt to stop Peddycoart from firing at Teamer—rather, Wilson intensified the situation by lunging forward to tear away Teamer's necklace.

13

Thus, the evidence showed Wilson knew Peddycoart was armed with a lethal weapon at the 7-11, the same lethal weapon Peddycoart had fired at a victim during the robbery the night before, and despite Wilson's proximity to both Peddycoart and Teamer, Wilson did nothing to stop the killing or minimize the possibility of violence. Under these circumstances, any reasonable juror would find Wilson acted with reckless indifference to human life. The inadvertent admission of the interview transcript was harmless beyond a reasonable doubt. This conclusion also defeats Wilson's claim of ineffective assistance of counsel, which requires a showing of prejudice. (See *People v. Simmons* (2023) 96 Cal.App.5th 323, 336 (*Simmons*).)

Attempting to avoid harmless error analysis, Wilson argues the error was structural and reversible per se. He reasons that because he believed all gang evidence would be excluded from trial, his counsel did not question jurors during voir dire to determine whether they might harbor biases against gang members. Accordingly, Wilson contends, he was denied adequate voir dire and the opportunity to make informed peremptory challenges, thus creating the possibility that one or more jurors were biased against him. (See *People v. Mil* (2012) 53 Cal.4th 400, 410 [a "biased decision maker" is one of a " ' "very limited class of cases" ' " " 'subject to automatic reversal' "].)

Wilson cites no case in which the inadvertent admission of evidence at trial gives rise retroactively to structural voir dire error, and the cases he does cite do not aid his argument. In *People v. Cash* (2002) 28 Cal.4th 703 (*Cash*), the Supreme Court reversed the defendant's judgment of death because the trial court prohibited defense counsel from asking jurors whether they would automatically impose the death penalty on a defendant

14

who had previously committed murder, there of his grandparents. (*Id.* at pp. 721, 723.) Notably, the court did not deem the error per se reversible, instead stating, "Error in restricting death-qualification voir dire does not invariably require reversal of a judgment of death." (*Id.* at p. 722.) In that case, however, the high court concluded the issue of the prior murder was "a *possibly determinative fact* for a juror," and because the trial court had barred questions on the subject, it was "impossible . . . to determine from the record whether any of the individuals who were ultimately seated as jurors held the disqualifying view that the death penalty should be imposed invariably and automatically on any defendant who had committed one or more murders other than the murder charged in this case . . . ." (*Id.* at p. 723, italics added.)

In *People v. Avila* (2006) 38 Cal.4th 491, the Supreme Court rejected the defendant's argument that the trial court erred by requiring him to exercise some of his peremptory challenges to jurors before all challenges for cause had been exercised. (*Id.* at pp. 537–538.) Although "[a] court commits reversible error if its procedures deny a party's right of peremptory challenge," the court held that rule did not apply because the defendant had exercised all of his peremptory challenges, just not in the order he wished. (*Id.* at p. 538.)

In *People v. Contreras* (2013) 58 Cal.4th 123, the defendant contended voir dire was inadequate because the trial court had not "question[ed] every prospective juror either individually or collectively about general principles of law concerning both the standard and burden of proof, and the presumption of innocence." (*Id.* at pp. 142–143.) The Supreme Court stated, "Unless the voir dire 'is so inadequate that the reviewing court can say that

15

the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal.' [Citations.]" (*Id.* at p. 143.)  The court concluded the defense had adequate opportunity to question the prospective jurors, and voir dire adequately covered the general principles of law in questionnaires and voir dire before the court.  (*Id.* at pp. 144–145.)

In *People v. Leon* (2015) 61 Cal.4th 569 (*Leon*), another case addressing limits on death qualification voir dire, the Supreme Court cited *Contreras* and held the defense had adequate opportunity to inquire about the jurors' views on the death penalty.[3]  (*Leon*, at p. 589.)

Because, as we have explained, Wilson's guilt for murder was conclusively established by properly admitted evidence, the inadvertent admission of the interview transcript was not "determinative," thus distinguishing this case from *Cash*.  For the same reason, the admission of that evidence did not render the trial fundamentally unfair under *Contreras* and *Leon*.  *Avila*'s reversal rule applies when the trial court prevents a defendant from exercising his peremptory challenges—it does not address the instant circumstance, in which a defendant argues merely that his peremptory challenges were inadequately informed

---

[3] In a section of *Leon* not cited or relied upon by Wilson, the Supreme Court held the trial court erred by dismissing jurors for cause based on their opposition to the death penalty without first inquiring whether the jurors could set aside their personal views and follow the law. (*Leon, supra*, 61 Cal.4th at pp. 592–593.)  The high court held this error required automatic reversal of the penalty verdict. (*Id.* at p. 593.)  That holding has no relevance here, where Wilson does not contend the trial court erroneously dismissed jurors for cause.

16

because of later erroneous admission of evidence. None of these cases compels the conclusion that the admission of the interview transcript was structural error.

Wilson notes the Supreme Court in *Cash* reversed in part because the trial court's erroneous limitations on voir dire rendered it "impossible . . . to determine from the record whether any of the individuals who were ultimately seated as jurors" held improper viewpoints. (*Cash*, *supra*, 28 Cal.4th at p. 723.) Wilson argues it is similarly impossible to determine whether any of the jurors here were biased against gang members, given his inability to question them on the subject, and therefore "the defect in the jury selection process cannot be found harmless."

Again, *Cash* did not mandate reversal in all instances where voir dire is improperly limited, instead stating such errors are subject to harmless error review. (*Cash*, *supra*, 28 Cal.4th at p. 722.) In that case, the error was not harmless because the issue on which the trial court prohibited voir dire was "possibly determinative." (*Id.* at p. 723.) Wilson's gang membership was *not* determinative given the overwhelming evidence of his guilt of special circumstance felony murder, and therefore *Cash* does not compel reversal.

Wilson argues the record reflects one of the jurors was in fact biased against gang members. During voir dire, a prospective juror[4] stated his cousin had been convicted of murder. Asked for his thoughts on his cousin's "situation," the juror said, "Well, I saw him going down the wrong path, being gang affiliated and doing drugs, so it wasn't really much of a

---

[4] Wilson represents, and the Attorney General does not dispute, that the prospective juror ultimately served on Wilson's jury.

17

surprise." The prosecutor asked the juror why he had not himself chosen "the gang life," and the juror stated, "I have a large family. I have seen that there are not many good outcomes of that life, either you leave it, you die, or end up in prison, so I didn't think that was suitable for me."

We do not agree these statements indicate a particular bias against gang members. We presume most law-abiding citizens would view gang membership as a "wrong path" often leading to death or prison, but this does not render them incapable of reaching a fair verdict when a gang member is involved. The juror gave no indication that he would presume a gang member's guilt based on his experience with his cousin, only that he was not surprised his cousin's choices led to criminality and prison. This is insufficient to establish bias necessitating reversal.

## B. The Trial Court Did Not Err In Admitting Evidence of Wilson's Prior Uncharged Conduct

Wilson contends that under Evidence Code section 1101, the trial court should have excluded evidence about prior uncharged robberies because the evidence was improper character evidence. Alternatively, Wilson argues the court should have excluded the evidence under Evidence Code section 352 because its potential for undue prejudice outweighed its probative value. We review admission of this evidence for abuse of discretion (*People v. Thomas* (2023) 14 Cal.5th 327, 358), and under that standard reject these arguments. Because the arguments fail on the merits, we do not reach the Attorney General's forfeiture arguments.

### 1.    Additional background

During trial, the court ruled over defense objection that the prosecution could introduce statements Wilson had purportedly made about a prior, uncharged robbery he had committed. The court ruled the statements were admissible as a party admission, and were relevant to the conspiracy charges and Wilson's state of mind as to whether he intended to aid and abet the robbery of Teamer.

K.P. testified that on a drive to Palmdale a few days before the Travelodge robbery, Wilson had told her he scared someone in an alley into giving him money. He told her he had taken $1,500.

A.P. testified that when she informed Wilson about Teamer's gold chain, she did so understanding Wilson "could take the chain" "[b]ecause of past situations he had told me about what he had did." Asked about the past robberies, A.P. said during a drive to Palmdale a few days before the 7-11 incident, Wilson told her that on an earlier occasion he, Peddycoart, and 5 Meals had followed a victim from a hotel to the victim's home and robbed the victim. Wilson said he waited in the car while Peddycoart threatened the victim with a gun and 5 Meals took the victim's jewelry. Wilson described the gun as an AK-47. A.P. testified she saw the jewelry Wilson told her he had taken.

### 2.    Analysis

Evidence Code section 1101 provides that, absent one of several exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct

19

on a specified occasion." (Evid. Code, § 1101, subd. (a).) Evidence of a defendant's prior crimes is nonetheless admissible "to prove some fact . . . other than his or her disposition to commit such an act," "such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . . ." (See *id.*, subd. (b).)

Wilson argues the prior robbery evidence was not relevant to prove his intent during the Teamer robbery because "there was nothing unique or especially similar between the description of the prior robberies and either of the current offenses such that the evidence helped to prove a disputed element of the offenses." Wilson further contends the prior acts evidence was cumulative of other evidence, such as the video "clearly establish[ing] [Wilson's] intent to rob Mr. Teamer of his neckl[ace]."

The uncharged robbery described by A.P. was similar to the charged robberies in that they were committed with Wilson, Peddycoart, and/or 5 Meals as a team, with Peddycoart handling the weapon. Evidence that Wilson previously had planned and committed robberies with Peddycoart tended to prove that Wilson intended to assist Peddycoart in robbing Teamer using a similar modus operandi. Although Wilson argues on appeal the video evidence clearly established his intent, thus rendering the prior acts evidence unnecessary, at trial his counsel argued the video evidence did not establish Wilson intended to rob Teamer. Instead, counsel argued the video suggested Wilson was sending Peddycoart away from the area because Peddycoart was "trigger-happy." Given the defense's position that Wilson did not intend to assist Peddycoart in robbing Teamer, the prosecution was entitled to introduce evidence tending to show the contrary.

Although evidence admitted under Evidence Code section 1101, subdivision (b) cannot be " 'merely cumulative with respect to other evidence which the People may use to prove the same issue' " (*People v. Guerrero* (1976) 16 Cal.3d 719, 724), here, it was the fact of a *pattern* of similarly executed robberies that tended to show Wilson's intent during the 7-11 robbery. Proof of a pattern necessarily requires evidence of multiple instances of similar offenses. Such proof is not cumulative, but instead, essential to establishing the pattern.

The trial court did not abuse its discretion under Evidence Code section 352 either. That statute grants a court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Similar to his argument under Evidence Code section 1101, Wilson contends because the video evidence and A.P.'s and K.P.'s testimony established his intent, the prior crimes evidence was, at best, marginally necessary and therefore served only to inflame the jury against him. Wilson further argues the probative value of the prior crimes evidence was minimal because apart from the sisters' testimony, there was no evidence those crimes occurred, and the sisters' testimony was suspect because they were testifying under immunity grants.

We have already explained that the prior crimes evidence was probative of a pattern of crimes jointly planned and committed by Wilson and Peddycoart, which in turn tended to show Wilson's intent during the 7-11 incident. The trial court was within its discretion to let the jury decide whether the

21

evidence was credible. As for undue prejudice, evidence of a prior uncharged robbery with no indication the victim was injured would be far less inflammatory than the evidence of the charged crimes, in which Peddycoart opened fire on fleeing victims, injuring one and killing another.

We further conclude, assuming arguendo the trial court erred under Evidence Code sections 1101 or 352 in admitting the prior crimes evidence, Wilson fails to show prejudice. The only prejudice claimed by Wilson is that error might have affected the jury's determination that he acted with reckless indifference to human life during the 7-11 robbery. As explained in the previous section, *ante*, other admissible evidence clearly established Wilson acted with reckless indifference, and therefore the prior crimes evidence, if arguendo erroneously admitted, did not affect the outcome, even under the *Chapman* standard for federal constitutional error.

Wilson argues there was undue prejudice because the trial court did not provide any instructions limiting the jury's consideration of the prior crimes evidence to the purposes for which it was introduced.[5] Wilson identifies nothing in the record indicating the defense requested such an instruction.

---

[5] The Attorney General notes the trial court instructed the jury with CALCRIM No. 303, stating, "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." At no point, however, did the trial court indicate to the jury that the prior crimes evidence was admitted for a limited purpose; therefore, the jury would have no reason to know CALCRIM No. 303 applied to the prior crimes evidence.

Accordingly, the argument is forfeited. (See *People v. Pineda* (2022) 13 Cal.5th 186, 238, fn. 29.)

To the extent Wilson suggests his counsel was ineffective for failing to object to the prior crimes evidence or request a limiting instruction, the absence of prejudice discussed previously defeats such a claim. (*Simmons*, *supra*, 96 Cal.App.5th at p. 336.) Counsel also might have made the tactical decision not to draw further attention to the prior crimes evidence by objecting or requesting specific instructions addressing that evidence. (See *People v. Orloff* (2016) 2 Cal.App.5th 947, 955 [" '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' "].)

## C. Wilson Has Not Demonstrated Reversible Cumulative Error

Wilson contends the errors in admitting K.P.'s interview transcript and the evidence of his prior crimes, even if not reversible on their own, cumulatively mandate reversal. We have concluded Wilson suffered no prejudice from the admission of the interview transcript, and the trial court did not err in admitting the prior crimes evidence. Accordingly, there was no cumulative error.

## D. The Accessory Conviction Must Be Reversed

Wilson argues because he was convicted of aiding and abetting the Travelodge robbery, he cannot also be convicted as an accessory to that crime. Under the facts of this case, we agree.

23

### 1. Applicable law

Section 31 defines "principals" in a crime, in relevant part, as "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." Section 32 defines "accessory" as "[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof . . . ."

Our Supreme Court has established that a defendant may be guilty both as a principal and as an accessory to the same crime. (*People v. Jennings* (2010) 50 Cal.4th 616, 668 ["A defendant can be convicted of both murder and being an accessory to murder if the defendant aids the principal both before and during, as well as after, the murder is committed."].) In reaching this conclusion, the high court cited with approval *People v. Mouton* (1993) 15 Cal.App.4th 1313 (*Mouton*) and *People v. Riley* (1993) 20 Cal.App.4th 1808 (*Riley*).

In *Mouton*, during an argument between two men, one drew a gun and fired at the other, missing and killing an uninvolved bystander. (*Mouton, supra,* 15 Cal.App.4th at p. 1317.) At trial, the prosecutor argued the defendant was an aider and abettor because he "agree[d] to make an armed show of force with" the perpetrator, brought the perpetrator to the apartment where the murder occurred, and "st[ood] ready to assist with an additional weapon as [the perpetrator] confronted [the intended victim]." (*Id.* at p. 1324.) The prosecutor argued

24

the defendant also was an accessory because, following the murder, the defendant "help[ed] in concealing [the perpetrator's] jacket and gun" and made "false statements to the police." (*Ibid.*) The jury convicted the defendant of both the murder and acting as an accessory to the murder. (*Id.* at p. 1321.) With the agreement of the prosecutor, however, the trial court stayed the sentence on the accessory conviction. (*Id.* at p. 1325, fn. 6.)

The Court of Appeal rejected the defendant's argument that he could not be convicted of both offenses. "[T]here is no bar to conviction as both principal and accessory where the evidence shows distinct and independent actions supporting each crime. When a felony has been completed and a person knowingly and intentionally harbors, conceals or aids the escape of one of the felons, that person is guilty as an accessory to a felony under section 32, whatever his or her prior participation in the predicate felony." (*Mouton*, *supra*, 15 Cal.App.4th at p. 1324.) Here, the two convictions were not based on the same acts—the murder conviction was based on the defendant's conduct "before and during the shooting incident," whereas the conduct underlying the accessory conviction took place after. (See *ibid.*) "Although defendant was technically convicted of being an accessory to his own crime, in substance he was convicted for two different sets of actions." (*Id.* at pp. 1324–1325.)

In *Riley*, a man, Hayden, robbed a prostitute in a motel room, but the prostitute's boyfriend, Rowe, accosted Hayden as he was leaving the room and took the money back. Hayden rode off on his motorcycle, "vow[ing] to return" "[i]n a loud, angry voice." (*Riley*, *supra*, 20 Cal.App.4th at p. 1810.) Hayden returned to the motel with the defendant in the defendant's truck 30 to 45 minutes later. The defendant drove slowly around the motel

parking lot, stopping the truck near David Woods, who was in the parking lot with other motel residents.  Hayden fired several gunshots from the truck, killing Woods.  (*Ibid.*)

The day after the killing, the defendant gave a gun to his business partner "for safekeeping."  (*Riley*, *supra*, 20 Cal.App.4th at p. 1810.)  The defendant bragged the gun had been used in a killing.  (*Id.* at pp. 1810–1811.)  When police later obtained the gun, it matched a bullet found at the crime scene.  (*Id.* at p. 1811.)

The jury convicted the defendant for both a murder count and accessory to murder count.  (*Riley*, *supra*, 20 Cal.App.4th at p. 1812.)  The trial court imposed sentence on both counts, with the accessory sentence to run concurrent with the murder sentence.  (*Ibid.*)

As in *Mouton*, the Court of Appeal rejected the argument that the defendant could not be convicted as a principal and an accessory.  "Here, . . . the conviction as a principal and the conviction as an accessory depend upon entirely different conduct:  Defendant's acts of obtaining the gun and speed loader, giving them to a drunk and angry Hayden, suggesting that Hayden return to the motel to retrieve his property, and driving Hayden to the motel in defendant's truck comprise the essentials of his guilt as a principal to the murder.  The conviction of accessory is based on defendant's act, the following day, of attempting to dispose of the gun.  This act occurred after the murder was complete."  (*Riley*, *supra*, 20 Cal.App.4th at pp. 1814–1815.)  "Once the murder was completed, defendant's further acts of attempting to dispose of the murder weapon were entirely separate and distinct, and served a further and different

26

purpose. The imposition of separate liability for these distinct and independent actions was proper." (*Id.* at pp. 1816–1817.)

*In re Malcolm M.* (2007) 147 Cal.App.4th 157 (*Malcolm M.*) agreed with *Mouton* and *Riley* that a defendant potentially could be convicted both as a principal and as an accessory to a felony, but only if "the acts constituting that felony . . . have ceased at the time of the conduct that violates section 32. Otherwise, the conduct of aiding or concealing a principal with the intent that he or she avoid arrest (§ 32) is subsumed into the conduct of aiding the commission of the crime with the intent or purpose of facilitating commission of the offense [citation], such that the defendant is 'concerned in the commission of a crime' (§ 31) and is therefore a principal in its commission [citation]. This is because an intent to help the perpetrator get away, formed before cessation of the acts constituting the felony, constitutes aiding and abetting." (*Malcolm M.*, at p. 171.)

Applying these principles, *Malcolm M.* concluded the defendant could not be convicted as an aider and abettor and accessory after the fact to possession of an assault weapon. (*Malcolm M.*, *supra*, 147 Cal.App.4th at pp. 164–165.) The juvenile court had found the defendant guilty as an aider and abettor because he "acted as [the perpetrator's] 'eyes and ears' when [the perpetrator] exited the vehicle" while armed. (*Id.* at p. 164.) The accessory count was based on the defendant attempting to conceal the weapon when police later stopped the vehicle. (*Ibid.*) The reviewing court held that the perpetrator's "possession of the assault rifle was a continuing offense that extended throughout the entire time he asserted dominion and control over that weapon," and thus the offense "had not been 'completed' for purposes of section 32" at the time defendant

27

attempted to conceal the weapon. (*Malcolm M.*, at pp. 169–170.) "Because the crime was still in progress, [the defendant's] presumable purpose of helping [the perpetrator] avoid arrest for possession was subsumed within, and was not separable from, his purpose of facilitating [the perpetrator's] commission of the offense, and his act aided [the perpetrator] in his criminal endeavor. Accordingly, he aided and abetted [the perpetrator's] continued felonious possession of the weapon." (*Id.* at p. 170.)

### 2. Analysis

In the instant case, the prosecutor argued at trial that Wilson was guilty as an accessory to the Travelodge robbery based on "picking up the duffel bags and bringing them back to the room, the change of clothes, the AK." The prosecutor argued, "[T]hat conduct is beyond just the robbery. It's part of the robbery conspiracy, that the robbery itself ended, but the planning afterwards to take and hide the duffel bag, that's why there's sufficient evidence" to support an accessory conviction.

At first blush, it would appear the prosecutor's accessory theory is consistent with *Mouton* and *Riley*—at the time Wilson collected the duffel bags and rifle, the robbery itself was complete, and thus Wilson's acts arguably were separate and distinct from the robbery.

What differs between the instant case and *Mouton* and *Riley*, however, is that Wilson's intent to collect the items after the robbery was, in the words of *Malcolm M.*, "formed before cessation of the acts constituting the felony." (*Malcolm M.*, *supra*, 147 Cal.App.4th at p. 171.) The testimony at trial established that Wilson was the ringleader of the Travelodge robbery, and it was he who came up with the plan that Peddycoart and 5 Meals would change their clothing after the

28

robbery and leave the clothing and rifle in the alley for Wilson to collect. Because Wilson's role in collecting the clothing and rifle was part of the plan from the outset, and his intent to perform that role formed before the robbery had taken place, his post-robbery actions were "subsumed within, and w[ere] not separable from, his purpose of facilitating [the perpetrator's] commission of the offense, and his act aided [the perpetrator] in his criminal endeavor." (*Id.* at p. 170.)

Put another way, Wilson's post-robbery actions were the means by which he intended from the outset to aid and abet the robbery. Those actions therefore could not subject him to culpability as both an aider and abettor and as an accessory after the fact. The accessory conviction must be reversed. Given this conclusion, we do not reach Wilson's alternative argument that the trial court should have stayed execution of sentence on the accessory conviction under section 654.

## E. Section 654 Requires Staying Execution of Sentence on Count 2, Robbery

"Section 654 provides that the same act or omission shall not be punished under more than one provision of law." (*People v. Montes* (2014) 58 Cal.4th 809, 898.) As relevant here, section 654 bars imposing punishment on a defendant both for felony murder and the predicate felony underlying that murder. (*Ibid.*) Here, the trial court imposed and executed sentence for both the murder, count 1, and underlying robbery of Teamer, count 2. Wilson argues, and the Attorney General agrees, this was error. Although the trial court properly imposed a sentence on count 2, it was required under section 654 to stay execution of that sentence. (See *People v. Duff* (2010) 50 Cal.4th 787, 796 (*Duff*).)

29

Because the trial court selected count 2 as the principal count when setting the total determinate term, resentencing is required on the other determinate terms as well.

## F. The Trial Court Should Impose and Stay Execution of Sentence on the Conspiracy Counts 4 and 7

The trial court ruled the two conspiracy counts, counts 4 and 7, were subject to section 654, and did not impose sentence on those counts. As noted in the previous section, the proper procedure under section 654 is to impose sentence, but stay execution of that sentence. (*Duff*, *supra*, 50 Cal.4th at p. 796.) We requested and received supplemental briefing from the parties on this issue. On remand, the trial court should impose, but stay execution of, sentence on counts 4 and 7.

## DISPOSITION

The conviction on count 5 is reversed. The convictions otherwise are affirmed. The entire sentence is vacated. On remand, the trial court shall impose, but stay execution of, sentence on counts 2, 4, and 7 pursuant to Penal Code section 654. The trial court shall resentence Wilson on counts 1, 6, and 9, and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


BENDIX, J.

We concur:


ROTHSCHILD, P. J.          CHANEY, J.

30